567 A.2d 312

Merideth I. GINGOLD

v.

AUDI–NSU–AUTO UNION, A.G., Volkswagenwerk
Aktiengesellschaft, Volkswagen of America, Inc.

v.

James McCLOSKEY.

Appeal of AUDI–NSU–AUTO UNION, A.G., Volkswagenwerk
Aktiengesellschaft, and Volkswagen of America, Inc.

Merideth I. GINGOLD, Appellant,

v.

AUDI–NSU–AUTO UNION, A.G., Volkswagenwerk
Aktiengesellschaft, Volkswagen of America, Inc.,
and James McCloskey.

Superior Court of Pennsylvania.

Argued March 1, 1989.

Filed Dec. 6, 1989.

Reargument Denied Feb. 20, 1990.

Larry E. Coben and Donald E. Matusow of Litvin, Blumberg, Matusow & Young, Philadelphia, for appellant.

Meridith I. Gingold and Edward W. Madeira, Jr., and Stephen Phillips, Philadelphia, for Audi.

Before DEL SOLE, MELINSON and HOFFMAN, JJ.

MELINSON, Judge:

This case involves an action for wrongful death and relief under the Survival Act[1] brought by the appellant in No. 2059, Merideth I. Gingold, Executrix of the Estate of Richard A. Gingold, deceased, (hereinafter "Gingold") against the appellants in No. 2058, Audi–NSU–Auto Union, Inc., Volkswagenwerk Aktiengesellschaft, and Volkswagen of America, Inc. (hereinafter collectively referred to as "Audi") and James McCloskey. It arises from a motor vehicle accident in which Richard A. Gingold was killed. For purposes of our review, we adopt the facts set forth by the trial court:

On February 10, 1984, at 6:30 a.m., Richard Gingold, age 36, was seated in the driver's seat of a 1983 Audi 5000 S automobile, waiting for [a] red light on Roosevelt Boulevard to change to green. At that time, defendant, James McCloskey, was driving his 1973 Cadillac in the same direction. McCloskey failed to observe Gingold's car or the red light and rear-ended the Audi at approximately 50 miles an hour. The rear end of the Audi was crushed forward on impact[,] and the two cars stayed together travelling a distance of 44 feet. The Audi then separated from the Cadillac and continued to go forward until the car's front end hit a tree at about 25 miles per hour.

The first officer on the scene noted that Gingold was wearing a seat belt over his suit jacket and overcoat. Although rushed to the nearest hospital, Gingold was pronounced dead on arrival.

A postmortem examination revealed that Gingold suffered severe facial injuries, brain damage, and injuries to the spinal cord. The examining physician allegedly stated that Gingold's fatal injuries were attributable to the frontal collision which caused Gingold to be thrown forward into the steering wheel and not due to the rear-end

1. 20 Pa.Con.Stat.Ann. § 3371 *et seq.* and 42 Pa.Con.Stat.Ann. § 8302.

collision. (Plaintiff's memo, pp. 3–4). It is [un]disputed that at the time of the accident, the deceased was wearing a manual three-point seat belt which complied with the [Federal National Traffic and Motor Vehicle Safety] Act and other applicable FMVSS [Federal Motor Vehicle Safety Standards], including FMVSS 208 governing occupant restraint systems. (*Id.* at 4).

Gingold filed a wrongful death and survival action against Audi, alleging negligence, products liability, and breach of warranty, and against McCloskey, alleging negligence. Among Gingold's claims against Audi were allegations that Audi had defectively designed the automobile in which Richard Gingold died by failing to install "passive restraints," a term which includes air bags, passive or automatic seat belts, knee bolsters and other unidentified items or systems.[2] Audi moved for partial summary judgment on the grounds that Gingold's passive restraint claims are preempted by the Federal National Traffic and Motor Vehicle Safety Act, 15 U.S.C. §§ 1381–1431, (hereinafter the "Act") and by certain Federal Motor Vehicle Safety Standards promulgated under the Act (hereinafter singularly and collectively "FMVSS" or "safety standard[s]"), in particular FMVSS 208, 49 C.F.R. 571.208. FMVSS 208 sets forth standards regarding automobile occupant restraints. *Kolbeck v. General Motors Corp.*, 702 F.Supp. 532 (E.D.Pa. 1988). Audi also contended that state law barred Gingold's passive restraint claims.

The trial court agreed to a limited extent with Audi, holding that the Act preempted a state common law tort

**2.** An automobile passive restraint system is a system which does not require any action by the occupant in order to be effective, and would include devices such as air bags, which are deflated bags stored under the dashboard or in the steering wheel of an automobile that inflate very rapidly when the car suddenly decelerates or upon a specific impact to the car, and automatic seat belts, which move into place automatically when the passenger sits in a seat and closes the door. *See Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *State Farm Mutual Automobile Insurance Co. v. Dole*, 802 F.2d 474 (D.C.Cir.1986), *cert. denied, New York v. Dole*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987).

action against an automobile manufacturer for failure to install air bags. At the same time, however, the court concluded that Gingold's claim that the vehicle was defectively designed and manufactured was not the equivalent of a "no air bag" claim,[3] that material issues of fact were still outstanding on this issue, and that, accordingly, Audi's motion for partial summary judgment must be denied. The court effectively granted Audi partial relief, however, by finding federal preemption of common law "no air bag" claims.[4]

3. The trial court defines a "no air bag" claim as an allegation that an automobile is defective because the manufacturer did not install air bags in the vehicle.

4. Our summary of the trial court's disposition requires that we explain the procedural background in which this disposition arose. On October 1, 1987, the trial court initially denied Audi's motion for partial summary judgment without issuing an opinion or stating its grounds for denial in the order. Thereafter, Audi petitioned the court for reconsideration, which was subsequently granted. Following reconsideration, the trial court entered its order of May 12, 1988, which is the subject of this appeal:

AND NOW, this 12th day of May, 1988, it is hereby ORDERED and DECREED that the defendants' Motion for Partial Summary Judgment is DENIED. [Opinion attached.]

Notwithstanding the direct language of the order, the trial court's accompanying opinion extensively analyzed the preemption issue and set forth, *inter alia,* the following conclusion:

This court is persuaded that FMVSS 208 and 15 U.S.C. §§ 1410b and 1392(d) compel the conclusion that a "no-airbag" claim is federally preempted under the doctrine of implied preemption. A plaintiff is precluded from alleging that a vehicle is defective because no airbag system was installed.

Thereafter, on June 7, 1988, the trial court entered the following order:

AND NOW, this 7th day of June, 1988, upon consideration of the Motion of Plaintiff for Certification for Permissive Interlocutory Appeal Pursuant to 42 Pa.C.S.A. § 702(b), it is hereby

ORDERED that the Opinion and Order of this Court dated May 12, 1988, finding, *inter alia,* federal preemption of the plaintiff's passive restraint system claims and precluding plaintiff from offering any evidence of alternative seat belt system designs is hereby certified for permissive interlocutory appeal pursuant to 42 Pa.C.S.A. § 702(b), it being the opinion of the Court that this Opinion and Order presents a controlling question of law of significant aspects of plaintiff's claim, as to which there is substantial ground for difference of opinion, and that an immediate appeal from this decision may materially advance the ultimate termination of this matter.

On appeal, Gingold argues that the court erred by directing that she would be precluded from presenting evidence of defect based upon Audi's failure to install air bags, while Audi maintains that its motion for partial summary judgment should have been granted.[5] Audi contends that its compliance with FMVSS 208 preempts any claim based upon its failure to install a passive restraint system under the Act and under Pennsylvania law. Audi further contends that Gingold's claims are not cognizable in Pennsylvania. On July 12, 1988, this court granted special allowance for appeal on the matter certified for permissive interlocutory appeal by the lower court pursuant to 42 Pa.Con.Stat. Ann. § 702(b). On August 30, 1988, the parties stipulated that their separate appeals were to be consolidated pursuant to Pa.R.A.P. 513.

The issue of federal preemption of common law passive restraint claims, though the subject of a great number of federal and state court decisions, has until now never come before the appellate courts of this Commonwealth. Some years ago, in *Jackson v. Spagnola,* 349 Pa.Super. 471, 503 A.2d 944 (1986), *appeal denied,* 514 Pa. 643, 523 A.2d 1132 (1987), this court stated that a manufacturer's compliance with a FMVSS did not grant immunity from a strict liability claim. The court, however, was not required by the issues presented to engage in an analysis of the Act or of FMVSS 208 and found support for its proposition by citation to decisions of other jurisdictions. Courts which have en-

Therefore, while the trial court's order of May 12, 1988 on its face totally denies Audi's motion for partial summary judgment, the trial court's accompanying opinion makes it clear that the trial court granted some of the relief Audi had sought. This is confirmed in the court's subsequent order of June 7, 1988. Thus, Gingold has also appealed the trial court's order of May 12, 1988.

5. Although presented as a motion for partial summary judgment, Audi's motion perhaps may be better characterized as a motion *in limine* as it seeks to preclude Gingold from presenting evidence concerning her passive restraint claim. *See Murphy v. Nissan Motor Corporation in U.S.A.,* 650 F.Supp. 922 (E.D.N.Y.1987), *reconsideration denied,* No. 84–CV–4556 (ERK) (March 17, 1987). Characterized in this way, the trial court's holding, finding a degree of Federal preemption, is effectively a partial grant and partial denial of Audi's motion.

gaged in analyses of the Act and FMVSS 208 have come to widely divergent conclusions, with the majority finding federal preemption of common law passive restraint claims.[6] Our analysis, however, leads us to join the ranks of the minority and permit Gingold's passive restraint claims to go forward.

## I. The Act and FMVSS 208

Congress passed the Act in 1966 as a response to mounting highway deaths and injuries. *State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d 474, 477 (D.C.Cir.1986), *cert. denied, New York v. Dole*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). The first section of the Act, entitled "Congressional declaration of purpose," states: "Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. Accordingly, courts have consistently held that the primary objective of Congress in passing the Act was to promote safety and reduce highway deaths and injuries. *See, e.g., Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir.1988); *Chrysler Corp. v. Tofany*, 419 F.2d 499 (2d Cir.1969); *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968); *Kolbeck*, 702 F.Supp. 532; *Murphy v. Nissan Motor Corp. in U.S.A.*, 650 F.Supp. 922 (E.D.N.Y.1987); *Garrett v. Ford Motor Co.*, 684 F.Supp. 407 (D.Md.1987); *Arbet v. Gussarson*, 66 Wis.2d 551, 225 N.W.2d 431 (1975).

**6.** A minority of courts has found that the Act and FMVSS 208 do not preclude state common law actions based upon failure to install passive restraint systems in automobiles. *See, e.g., Garrett v. Ford Motor Co.*, 684 F.Supp. 407 (D.Md.1987); *Murphy*, 650 F.Supp. 922. Other courts have found that passive restraint claims are expressly preempted by Federal law. *See, e.g., Cox v. Baltimore County*, 646 F.Supp. 761 (D.Md.1986); *Vanover v. Ford Motor Co.*, 632 F.Supp. 1095 (E.D.Mo.1986). Still other courts have found "implied" preemption of such claims, while not finding express preemption. *See, e.g., Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir.1989); *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir.1988); *Kolbeck v. General Motors Corporation*, 702 F.Supp. 532 (E.D.Pa.1988); *Staggs v. Chrysler Corp.*, 678 F.Supp. 270 (N.D.Ga.1987). We note, however, that a great number of the courts finding preemption have relied upon prior decisions in lieu of independent analysis and review.

The Act attempts to achieve its goal to promote automotive safety in various ways. The Act provides for research, testing, and training in traffic safety. 15 U.S.C. § 1395. It also requires automobile manufacturers to notify the public of safety defects in their products. The manufacturers must repair these defects. 15 U.S.C. §§ 1411–19. Finally, the Act provides that the Department of Transportation shall promulgate "Federal motor vehicle safety standards" (FMVSS) and prohibits the manufacture or sale of automobiles or automobile equipment which fail to comply with these standards. 15 U.S.C. §§ 1392, 1394, 1396, and 1397. The Act provides for enforcement by means of civil penalties and injunctive relief by action of the United States Government. 15 U.S.C. §§ 1398–99. The Department of Transportation is also authorized to investigate compliance with the Act. 15 U.S.C. § 1401. *See also Murphy,* 650 F.Supp. at 924.

It was intended that the safety standards promulgated under the Act were to be "uniform throughout the country." S.Rep. No. 1301, 89th Cong., 2d Sess. 12 (1966), *reprinted in,* 1966 U.S.Code, Cong. & Admin.News, 2709. This intention is articulated, to a degree, in section 1392(d) of the Act. Section 1392(d) provides that whenever an FMVSS is established, a state is expressly prohibited from establishing a safety standard different from the FMVSS concerning "the same aspect of performance."[7] "Basically,

---

**7.** Section 1392(d) provides in full:

 Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.

this preemption subsection is intended to result in uniformity of standards so that the public as well as the industry will be guided by one set of criteria rather than a multiplicity of diverse standards." H.Rep. No. 1776, 89th Cong., 2d Sess. 17 (1966). We also note that the Act defines "motor vehicle safety standards" as "a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." 15 U.S.C. § 1391(2).

In 1966, the Department of Transportation first adopted FMVSS 208, 49 C.F.R. § 571.208. It is a lengthy regulation which has been described as having suffered a "complex and convoluted" regulatory history. *Kolbeck,* 702 F.Supp. at 535. *See also Motor Vehicle Manufacturers Association of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Dole,* 802 F.2d 474. Its "scope" is stated as follows: "This standard specifies performance requirements for the protection of vehicle occupants in crashes." 49 C.F.R. § 571.208 S1. Its purpose "is to reduce the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, and by specifying equipment requirements for active and passive restraint systems." 49 C.F.R. § 571.208 S2.

For passenger cars manufactured between September 1, 1973 and September 1, 1986, FMVSS 208 allows for three "options." [8] The first option allows for manufacturers to equip the car with a complete passive restraint system, which is designed to protect occupants from front and lateral crashes. 49 C.F.R. § 571.208 S4.1.2.1. The second option allows manufacturers to utilize a combination of passive restraints (to protect against frontal crashes), detachable shoulder harnesses, lap belts, and warning sys-

15 U.S.C. § 1392(d).

**8.** The automobile in question was a model 1983 Audi.

tems to remind the occupant to fasten his seat belt. 49 C.F.R. § 571.208 S4.1.2.2. The third option permits manufacturers to install a lap belt with a non-detachable shoulder harness and a belt warning system. 49 C.F.R. § 571.208 S4.1.2.3. The third option, providing for a "three-point" seat belt, was the option chosen by Audi in the manufacture of the vehicle in question and indeed appears to be the overwhelming choice of automobile manufacturers in general. *See Schwartz v. Volvo North America Corp.*, 554 So.2d 927 (Ala.1989) (Hornsby, C.J., concurring and dissenting). Audi's compliance with FMVSS 208 is the foundation for its argument that Gingold's passive restraint claims are preempted.

The Act, however, sets forth a savings clause in section 1397(c). This section provides in full:

Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under the common law.

15 U.S.C. § 1397(c). This section is the foundation of Gingold's argument that her claims are not preempted by the Act.

There is another section to the Act relevant to our discussion. In 1974, Congress amended the Act after a "public outcry" against a proposed regulation which would have provided for an "ignition interlock" system to "prevent starting [a] vehicle if the [safety] belts were not connected." *Motor Vehicles Manufacturers Association*, 463 U.S. at 35–36, 103 S.Ct. at 2862–63. The result was the addition of section 1410b which provides in pertinent part:

(2) Except as otherwise provided in paragraph (3), no Federal motor vehicle safety standard respecting occupant restraint systems may—

(A) have the effect of requiring, or

(B) provide that a manufacturer is permitted to comply with such standard by means of,

an occupant restraint system other than a belt system.

(3)(A) Paragraph (2) shall not apply to a Federal motor vehicle safety standard which provides that a manufac-

turer is permitted to comply with such standard by equipping motor vehicles manufactured by him with either—

(i) a belt system, or

(ii) any other occupant restraint system specified in such standard.

(B) Paragraph (2) shall not apply to any Federal motor vehicle safety standard which the Secretary elects to promulgate in accordance with the procedure specified in subsection (c) of this section, unless it is disapproved by both Houses of Congress by concurrent resolution in accordance with subsection (d) of this section.

15 U.S.C. § 1410b. The section thereupon sets forth the manner in which the Secretary of Transportation shall promulgate safety standards under this section and the manner in which Congress shall have an opportunity to veto such standards.

Our determination of the initial issues raised by Audi and Gingold in these appeals rests upon our careful analysis of the aforementioned legislation and regulations.

## II. The Standard for Preemption

In determining whether a state cause of action is preempted by federal law, our "sole task is to ascertain the intent of Congress." *California Federal Savings and Loan Association v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). *See also Louisiana Public Service Commission v. F.C.C.,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Fidelity Federal Savings and Loan Association v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Congress is empowered to preempt state law by the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution. *Louisiana Public Service Commission,* 476 U.S. at 368, 106 S.Ct. at 1898. Thus, preemption " 'is compelled [when] Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). When Congress does not expressly

state its intent to preempt state law, its intent to supercede state law "may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary regulation." *Guerra*, 479 U.S. at 281, 107 S.Ct. at 689. Further,

> where the statutory language does not totally preempt state law, federal law preempts state law if the state law actually conflicts with federal law.

> Where preemption is claimed because of a state law conflict with Congressional action, federal law preempts the conflicting state law where compliance with both the federal and state regulations is a physical impossibility, or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Kolbeck*, 702 F.Supp. at 536 (citations omitted). *See also California v. ARC America Corp.*, 490 U.S. ——, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); *Silkwood v. Kerr–McGee Corporation*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), *reh'g denied*, 464 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984); *de la Cuesta*, 458 U.S. 141, 102 S.Ct. at 3014.

■ Federal regulations may have the same preemptive effect as federal statutes. *Louisiana Public Service Commission*, 476 U.S. 355, 106 S.Ct. at 1890; *de la Cuesta*, 458 U.S. 141, 102 S.Ct. at 3014. "The critical question in any pre-emption analysis," however, "is always whether Congress intended that federal regulation supercede state law." *Louisiana Public Service Commission*, 476 U.S. at 369, 106 S.Ct. at 1898. Moreover, "preemption is not to be lightly presumed." *Guerra*, 479 U.S. at 281, 107 S.Ct. at 689. "Overriding any preemption analysis is the presumption that the federal law does not displace existing state law." *Kolbeck*, 702 F.Supp. at 536. *See also Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981); *Rice v. Santa Fe Elevator Corp.*, 331

U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181 (3d Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987).

The presumption against preemption is explained on grounds which recognize, among other things, the States' long-established interest in providing compensation for victims of torts. "[I]t is necessary to bear in mind ... the circumspect view courts must take of a claim that Congress has preempted states from exercising their traditional police powers on behalf of their citizens. The provision of tort remedies to compensate for personal injuries 'is a subject matter of the kind [the] Court has traditionally regarded as properly within the scope of state superintendence.' " *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1542 (D.C.Cir. 1984), *cert. denied, Chevron Chemical Co. v. Ferebee*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963)). "When Congress legislates in a field traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress.' " *ARC America Corp.*, 490 U.S. at ——, 109 S.Ct. at 1665–1666, 104 L.Ed.2d at 94 (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152). *See also Field v. Philadelphia Electric Company, et al.*, 388 Pa.Super. 400, ——, 565 A.2d 1170, 1174 (1989) and *Livingston v. Vanguard Federal Savings Bank*, 386 Pa.Super. 496, 499–500, 563 A.2d 175, 177 (1989). "The justification for such caution is that Congress certainly has the power to 'act so unequivocally as to make it clear that it intends no regulation but its own.' " *Rice*, 331 U.S. at 236, 67 S.Ct. at 1155. We assume that there is no preemption "to ensure that 'the federal—state balance ... will not be disturbed unintentionally by Congress or unnecessarily by the courts.' " *Livingston*, 386 Pa.Super. at 500, 563 A.2d at 177 (quoting *Rath Packing Co.*, 430 U.S. at 525, 97 S.Ct. at 1309). "Furthermore, if we are left in doubt as to congressional purpose,

we should be slow to find preemption, '[f]or the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden.' *Penn Dairies v. Milk Control Comm'n,* 318 U.S. 261, 275, 63 S.Ct. 617, 624, 87 L.Ed. 748 (1943)." *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 488 (9th Cir.1984), *cert. denied, Chevron U.S.A., Inc. v. Sheffield,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985).

### III. Congressional Intent

▪ To construe the Act and FMVSS 208 as Congress intended, we look first to the language of the legislation.

In interpreting a statute, the starting point is of course the language itself. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). It is to be presumed that "the legislative purpose is expressed by the ordinary meaning of the words used," *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962), and if the statutory language is clear, it is not necessary to examine the legislative history, *see TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978).

*Barnes v. Cohen,* 749 F.2d 1009, 1013 (3d Cir.1984), *cert. denied, Cohen v. Betson,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). *See also Philadelphia Housing Authority v. Commonwealth, Pennsylvania Labor Relations Board,* 508 Pa. 576, 581, 499 A.2d 294, 297 (1985) ("[O]ur attention must initially focus upon the terms and plain meaning of the Act").

With the issue of preemption before us, the terms of section 1397(c) strike us unequivocally: "Compliance with *any* Federal motor vehicle safety standard issued under this subchapter does not exempt any person from *any* liability under common law." (Emphasis supplied.) As the learned chief justice of the Alabama Supreme Court stated

with undeniable force, "[t]hat language is absolutely clear on its face, and ... must be taken to mean what it says." *Schwartz,* 554 So.2d at 935 (Hornsby, C.J., concurring and dissenting). Many courts have agreed. *See Larsen,* 391 F.2d 495, 506 ("It is apparent that the [Act] is intended to be supplementary of and in addition to the common law of negligence and product liability."); *Dawson v. Chrysler Corporation,* 630 F.2d 950, 958 (3d Cir.1980), *cert. denied, Chrysler Corp. v. Dawson,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) ("Compliance with the safety standards promulgated pursuant to the [Act] ... does not relieve Chrysler of liability in this [products liability] action."); *Sours v. General Motors Corporation,* 717 F.2d 1511, 1517 (6th Cir.1983) ("[T]he very federal safety statute upon which GM relies makes it abundantly clear that compliance with the regulations promulgated thereunder does not immunize a manufacturer from common law liability."); *Chrysler Corporation v. Department of Transportation,* 472 F.2d 659, 670 n. 13 (6th Cir.1972) ("Also, we note that 15 U.S.C. § 1397(c) expressly preserves all common law liability with respect to compliance with any Federal motor vehicle safety standard. Therefore, ... compliance with Federal standards is not a defense to a products liability action for failure to use reasonable care in design or construction to avoid subjecting the user to an unreasonable risk of injury...."). *See also Garrett,* 684 F.Supp. 407; *Murphy,* 650 F.Supp. 922.

The express language of section 1397(c) should conclude the matter. Audi is not immunized by Gingold's passive restraint claims based upon preemption. Audi raises a number of arguments, however, which attempt to neutralize the language of section 1397(c) and demonstrate that Congress's intent is other than what is expressed in that section, at least as far as passive restraint claims are concerned. We shall look at these arguments carefully, especially since the majority of courts which have entertained the issue of federal preemption of passive restraint claims has found preemption.

Audi first argues that Gingold's passive restraint claims are expressly preempted by section 1392(d) of the Act and thus cannot be saved by section 1397(c). In pertinent part, section 1392(d) provides:

[N]o State or political subdivision of a state shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal Standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal standard.

The basis for this argument requires that state common law damage awards be equated with establishment of state safety standards. Some courts, faced with the issue before us, have accepted this equation and held that passive restraint claims are preempted by section 1392(d) because of their divergence from FMVSS 208. *See Vanover v. Ford Motor Co.*, 632 F.Supp. 1095 (E.D.Mo.1986); *Cox v. Baltimore*, 646 F.Supp. 761 (D.Md.1986).

Additionally, this argument has merit only if section 1397(c) is given an extremely narrow construction. In *Cox*, 646 F.Supp. at 764, the court construed section 1397(c) as follows: "[T]he clear meaning of [section 1397(c)] is that compliance with the federal standards does not protect an automobile manufacturer from liability for design or manufacturing defects in connection with matters not covered by the federal standards." Otherwise, according to *Cox*, to apply section 1397(c) to "matters covered by the federal standards," the objectives of the Act (which the court determined to be uniformity of safety standards) would be frustrated.

We cannot agree, however, that section 1392(d) preempts state common law claims. First, the plain language of section 1392(d) "only prohibits the states from implement-

ing safety standards of their own." *Kolbeck,* 702 F.Supp. at 537. The section does not mention common law liability. *Id.; Schwartz,* 554 So.2d at 935 (Hornsby, C.J., concurring and dissenting). It follows that in the face of the broadly-worded section 1397(c) savings clause, if Congress had intended that section 1392(d) apply to common law claims as well as state created regulation it would have stated so. *Kolbeck,* 702 F.Supp. at 537; *Murphy,* 650 F.Supp. at 926; *Garrett,* 684 F.Supp. at 409; *Schwartz,* 554 So.2d at 935 (Hornsby, C.J., concurring and dissenting). *See also Baird v. General Motors Corp.,* 654 F.Supp. 28, 30 (N.D.Ohio 1986) ("Reading [sections 1397(c) and 1392(d)] in conjunction, it is clear that Congress did not intend to preempt common law liability when it established uniform national safety standards."). In so stating, we note that in other legislation Congress has articulated its intent to preempt not only state regulation but state common law as well. *See, e.g.,* 12 U.S.C. §§ 1715z–17(d), 1715z–18(e) (Supp.II 1984) (Domestic Housing and International Recovery and Financial Stability Act); 17 U.S.C. § 301(a) (Copyright Act of 1976); and 29 U.S.C. § 1144(a), (c)(1) (1982) (Employee Retirement Income Security Act of 1974). *See also Cipollone,* 789 F.2d 181; *Ferebee,* 736 F.2d 1529; *Kolbeck,* 702 F.Supp. 532; *Schwartz,* 554 So.2d at 935 (Hornsby, C.J., concurring and dissenting).

Further, we are not persuaded by Audi's argument that the allowance of common law tort claims is the equivalent of state regulation for purposes of section 1392(d). Audi bases this argument principally upon language set forth in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 246–47, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959):

> Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compen-

sation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.

While we do not dispute that common law damage awards can have a regulatory impact (*see, e.g., Glick v. Martin and Mohler, Inc.,* 369 Pa.Super. 428, 535 A.2d 626 (1987)), common law claims and regulation by state agencies or legislatures are not identical. In *Ferebee,* 736 F.2d 1529, an agricultural worker brought an action against a manufacturer of paraquat, alleging that he contracted a pulmonary disease as a result of long-term skin exposure to the herbicide. The Environmental Protection Agency ("EPA") devised regulations pertaining to warnings which manufacturers of paraquat and like chemicals are required to place on the labels of their products. The legislation which authorized the EPA to promulgate these regulations provided that a state "shall not impose or continue in effect any requirements for labeling ... in addition to or different from those required under this subchapter."[9] Notwithstanding the manufacturer's compliance with the EPA regulations pertaining to label warnings, the plaintiff brought suit based in part on the manufacturer's failure to provide adequate warnings on its label. The plaintiff prevailed. On appeal, the Circuit Court for the District of Columbia dismissed the manufacturer's preemption argument by drawing a distinction between regulation and state common law awards:

> The verdict itself does not command Chevron to alter its label—the verdict merely tells Chevron that, if it chooses to continue selling paraquat in Maryland, it may have to compensate for some of the resulting injuries. That may in some sense impose a burden on the sale of paraquat, but it is not equivalent to a direct regulatory command that Chevron change its label. Chevron can comply with both federal and state law by continuing to use the EPA-approved label and by simultaneously paying damages to successful tort plaintiffs....

**9.** Section 24(b) of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*

736 F.2d at 1541.[10] The analysis of Justice Blackmun in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (Blackmun, J., dissenting), is even more compelling. *Silkwood* involved a state tort action against a nuclear facility. The facility was governed by the Atomic Energy Act and the safety regulations promulgated by the Nuclear Regulatory Commission. The Court entertained the issue of whether a state award of punitive damages is preempted because the Atomic Energy Act precludes states from regulating the safety aspects of nuclear energy. The Court majority found that the award of punitive damages was not preempted by the Atomic Energy Act, finding that Congress intended that state law remedies, in whatever form, were to be preserved for those injured by nuclear incidents. In dissent, Justice Blackmun agreed with the nuclear facility that punitive damage awards were effectively equivalent to state regulation. In so stating, he drew a distinction between punitive damages (which he determined to be the equivalent of a regulatory fine) and compensatory damages:

> It is to be noted, of course, that the same preemption analysis [in which Justice Blackmun had engaged, finding that punitive damages were essentially the same as a fine imposed by a state] produces the opposite conclusion when applied to an award of compensatory damages. It is true that the prospect of compensating victims of nuclear accidents will affect a licensee's safety calculus. Compensatory damages therefore have an indirect impact on daily operations of a nuclear facility.... The crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate

**10.** The legislation in *Ferebee* is distinguishable from the Act in that this legislation permits a state to regulate the sale or use of any federally registered pesticide. This fact, however, does not alter the distinction between regulation, which is the state's command to an industry or population, and common law damage awards, which provide compensation on an individual basis. As the court in *Ferebee* pointed out, a manufacturer can comply with both a federal regulation and a common law compensatory apparatus, although perhaps sometimes uncomfortably. A manufacturer, however, cannot comply with federal and state regulatory commands which conflict.

safety, whereas the purpose of compensatory damages is to compensate victims. Because the Federal Government does not regulate the compensation of victims, and because it is inconceivable that Congress intended to leave victims with no remedy at all, the pre-emption analysis established by *Pacific Gas [ & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) ] comfortably accommodates—indeed it compels— the conclusion that compensatory damages are not pre-empted whereas punitive damages are.

. . . .

... When a victim is determined to be eligible for a compensatory award, that award is calculated by reference to the victim's injury. Whatever compensation standard a state imposes, whether it be negligence or strict liability, a licensee remains free to continue operating under federal standards and to pay for the injury that results. This presumably is what Congress had in mind when it preempted state authority to set administrative regulatory standards but left state compensatory schemes intact. Congress intended to rely solely on federal expertise in setting safety standards, and to rely on States and juries to remedy whatever injury takes place under the exclusive federal regulatory scheme. Compensatory damages therefore complement the federal regulatory standards, and are an implicit part of the federal regulatory scheme.

*Silkwood,* 464 U.S. at 263–4, 104 S.Ct. at 629–30 (Blackmun, J., dissenting) (footnote omitted).[11] We find this language particularly apt to the issue before us, where Congress expressly preempted state authority to set conflicting regulatory standards under section 1392(d) but left state compensatory schemes intact under section 1397(c). These sep-

---

**11.** Our citation to Justice Blackmun's dissent should not be interpreted as our endorsement of his view that an award of punitive damages achieves impermissible state regulation in any given context. We quote Justice Blackmun for his clear articulation of the distinction between regulation and compensatory tort awards.

arate provisions of the Act underscore the differences between regulation and common law compensation. Taking into account that state regulation and state common law torts are different, sections 1392(d) and 1397(c) complement each other well in light of the express purpose of the Act, i.e., the achievement of safety. Rather, it is Audi's argument that regulation and tort awards are effectively the same which strains the interplay between the sections.

Moreover, even if we were to assume that common law liability is the equivalent of state regulation, the matter is not necessarily resolved in Audi's favor. As the court in *Murphy,* 650 F.Supp. at 927, insightfully observed, the issue would then be "not whether common law liability is a form of regulation but whether it is the type of regulation Congress intended section 1392(d) to preempt.... Th[e] assumption [that Congress intended section 1392(d) to preempt common law claims] is unwarranted in light of Congress' express intention to preserve common law remedies [in section 1397(c) ]."

Further, we find Audi's narrow construction of 1397(c) without foundation. Its flaws are ably pointed out in *Schwartz,* 554 So.2d 935 (Hornsby, C.J., concurring and dissenting):

> [I]f the saving clause is said to touch only matters *not* covered by the federal safety standards, then its passage was unnecessary in the first instance. If no safety standards were applicable to a given case, then how could the Act even apply? If Congress itself, or an agency to which Congress lends its regulatory pen, has not spoken, surely a manufacturer cannot defend on the grounds that because Congress has required *nothing,* then the common law cannot do so either.... The function of the common law is to fill the interstices left by the legislatures. No statute need be enacted to say as much, and I cannot ascribe to Congress such a meaningless purpose regarding § 1397(c).

. . . .

The saving clause of the Act was not passed to accomplish anything as painfully obvious as permitting the common law to operate where Congress had not spoken to the contrary. Such would amount to frivolous and useless legislating, something the mass of legislative history supporting the Act and the weight of regulations promulgated pursuant to the Act belie.

(Emphasis in the original.) *See also Kolbeck*, 702 F.Supp. at 537 ("The courts which find express preemption of passive restraint claims ... construe the savings clause to apply only to matters not covered by the FMVSS, or in cases of negligent compliance with FMVSS. I am unable to find a basis to support such a narrow reading of the effect of section 1397(c)." (footnote omitted)). Indeed, by construing section 1397(c) so narrowly as to make its existence superfluous, which we must do in order to adopt Audi's position, we would in effect be rendering the section's plain language and purpose nugatory. To do so would offend "the well-settled rule that all parts of a statute, if possible, are to be given effect." *American Textile Manufacturers Institute, Inc. v. Donovan*, 452 U.S. 490, 513, 101 S.Ct. 2478, 2492, 69 L.Ed.2d 185 (1981). *See also de la Cuesta*, 458 U.S. at 163, 102 S.Ct. at 3027; *In re Recanvassing of Certain Voting Machines for Election of Republican Candidate for County Com'r in Nov. 1983 General Election*, 504 Pa. 593, 475 A.2d 1325 (1984); *Commonwealth v. Scott*, 376 Pa.Super. 416, 546 A.2d 96 (1988) (Court must construe statute, if possible, to give effect to every word).

Moreover, if there continued to remain a doubt as to the intention of Congress respecting the passage of section 1397(c), justifying a search through the legislative history to divine this intent,[12] this doubt would soon be dispelled. The legislative history confirms that Congress intended section 1397(c) to preserve all common law remedies for injuries arising from defective automobiles notwithstanding

---

12. "We resort to legislative materials only when the Congressional mandate is unclear on its face." *City of Rome v. United States*, 446 U.S. 156, 199, 100 S.Ct. 1548, 1573, 64 L.Ed.2d 119 (1980) (Powell, J., dissenting).

the manufacturer's compliance with the safety standards. The Senate Report states that "the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law." S.Rep. No. 1301, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad. News 2709, 2720. The House report further provides that Congress "intended, and this subsection [1397(c)] specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law, particularly those related to warranty, contract, and tort liability." H.R.Rep. No. 1776, 89th Cong., 2d Sess. 24 (1966). The remarks of individual Congressmen are unequivocal. "[C]ompliance with Federal standards does not exempt any person from common law liability." 112 Cong.Rec. 21,487 (1966) (remark of Sen. Magnusson). "[The Act leaves intact] every single common law remedy that exists against a manufacturer for the benefit of a motor vehicle purchaser. This means that all of the warranties and all of the other devices of common law which are afforded to the purchaser, remain in the buyer, and they can be exercised against the manufacturer." 112 Cong.Rec. 19,663 (1966) (remark of Rep. Dingell).

We find, therefore, that section 1392(d) does not preempt Gingold from pursuing her passive restraint claims.[13]

**13.** Audi relies also in large part upon the analysis and holding of *Ouellette,* 479 U.S. 481, 107 S.Ct. 805, in support of its argument that Gingold's passive restraint claims are preempted by section 1392(d). *Ouellette* is clearly distinguishable. In *Ouellette,* the Court found that certain state action was preempted under the Clean Water Act ("CWA"). The CWA also had a general savings clause. Nevertheless, the Court determined that the savings clause did not permit state action which interfered with the purposes of the CWA, stating that "we do not believe Congress intended to undermine this carefully drawn statute through a general savings clause." 479 U.S. at 494, 107 S.Ct. at 813. The Court found, however, that the plain language of the savings clause *did not* preclude preemption of the state action at issue. Thus, the Court could not conclude from the language of the savings clause (or elsewhere in the CWA) whether or not Congress intended the state action to be preempted. The Court was thereupon forced to extend its preemption analysis by an examination of the goals, policies, and history of the CWA, finding that the state action at issue

Audi argues further, however, that the intent of Congress is not fossilized in the year 1966.[14] Since that time, Congress has enacted section 1410b and the Department of Transportation has revised FMVSS 208. Audi argues that these provisions demonstrate Congress's more current intent to provide an automobile manufacturer with the option of installing either passive restraints or manual seat belts.

Section 1410b, however, directs its focus only to the content of FMVSS 208. This does not translate into an expression of intent by Congress to amend section 1397(c). Moreover, section 1410b does not "ensure that passive restraints would remain 'only an option,'" as Audi contends, even as limited to FMVSS 208. Rather, the Secretary of Transportation may promulgate a regulation which might destroy the "option" (i.e., mandate passive restraints in all automobiles) so long as both Houses of Congress have an opportunity to review this regulation in accordance with the procedure set forth in the section and do not disapprove of it. Section 1410b(b)(3)(B). Absent a congressional veto, the regulation will have full effect.[15] Had Congress intended to amend section 1397(c) by barring common law actions based upon a manufacturer's failure to incorporate passive restraints, it certainly had the power and mechanism to do

would seriously interfere with the full purposes and objectives of Congress in enacting the CWA.

In contrast, the plain language of section 1397(c) *does* preclude preemption of state common law claims, and such claims fully reflect the intent of Congress, as reflected in the Act's legislative history. Further, the CWA is legislation so "comprehensive and far reaching" that it fully occupies its field. *Ouellette,* 479 U.S. at 489, 107 S.Ct. at 810. The Act, however, was not intended to occupy the entire field of automotive safety. *See Kolbeck,* 702 F.Supp. at 536, n. 6.

Again, the issue in any preemption analysis is the intent of Congress. *Ouellette* merely demonstrates how a court may discern this intent if such intent is not clear from the plain language of the statute or regulations.

14. "Time—and Congress—have not stood still since 1966." Brief for appellant at No. 2058, p. 11.

15. We note that legislative vetoes, such as that contemplated in section 1410b, have been declared unconstitutional. *See Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

so. In light of the strong presumption against federal preemption and the very clear articulation by Congress in section 1397(c) that compliance with any FMVSS will not prevent any person from bringing any common law claim against a manufacturer, we cannot infer preemption from a section that directs its force, not to the public or the manufacturer, but to a regulatory agency.

Neither does the manufacturer's option in FMVSS 208 respecting occupant restraints override the plain language of section 1397(c). Audi suggests that because FMVSS 208 provides manufacturers with options from which they may choose to comply with the safety standard, this exhibits congressional intent, properly articulated through the Department of Transportation, to preempt any state common law action which may interfere with the manufacturer's ability to choose one of the options.[16] This argument, however, is flawed. Section 1397(c) provides that compliance with *any* safety standard does not exempt any person from any liability under the common law. It does not matter whether the FMVSS mandates a single standard or whether it provides for options. Assuming FMVSS 208 provided only for the installation of manual seat belts, a manufacturer's compliance would not exempt him from liability under the common law pursuant to section 1397(c). Clearly, this is no different from the circumstance where a manufacturer opts to install manual seat belts under FMVSS 208, or, indeed, if the manufacturer opted to install passive restraints. In neither case would compliance with the FMVSS shield the manufacturer from common law liability. Further, we note that FMVSS 208 is not the only

16. In particular, Audi argues that if passive restraint actions were not preempted (and provided they will prevail in court), then for Audi to avoid further liability it must adopt passive restraint systems in all of its vehicles. Thus, Audi would not have the option of installing the three-point seat belt in lieu of a passive restraint system, currently one of the three options set forth in FMVSS 208. Of course, the potential for common law damages does not technically prevent Audi from doing anything. Audi will continue to have all options set forth in FMVSS 208. State law does not prohibit this. *See Ferebee*, 736 F.2d at 1541.

safety standard which provides for an option.[17] If Congress had desired to restrict the scope of section 1397(c) it could certainly have stated within that section or another that the ability of a manufacturer to choose any option under the FMVSS shall not be curtailed by the common law. It did not.

Further, it is helpful to keep in mind the difference between the safety standards promulgated under the Act and the standards for conduct required by the common law, a difference recognized by Congress in the passage of section 1397(c). "[T]he purpose of [the] safety standards is to establish minimum performance standards for automotive safety; they do not establish the standard of conduct required under the common law." *Kolbeck*, 702 F.Supp. at 540.[18] "[F]ederal legislation has traditionally occupied a limited role as the *floor* of safe conduct; before transforming such legislation into a *ceiling* on the ability of states to protect their citizens, and thereby radically adjusting the historic federal-state balance, *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971), courts should wait for a clear statement of congressional

---

**17.** *See, e.g.,* FMVSS 101 (controls and displays); FMVSS 105 (hydraulic brake systems); FMVSS 106 (brake hoses); FMVSS 108 (lamps, reflective devices, and associated equipment); FMVSS 111 (rear view mirrors); FMVSS 120 (tire selection and rims); FMVSS 125 (warning devices); FMVSS 201 (occupant protection in interior impact); FMVSS 202 (head restraints); FMVSS 205 (glazing materials); FMVSS 207 (seating systems); FMVSS 213 (child restraint systems); FMVSS 217 (bus window retention and release). 49 C.F.R. § 571.101 *et seq.* (1986).

**18.** We must note, however, that the court in *Kolbeck* later determined that the plaintiff's passive restraint claims were preempted because they would, as Audi argues in the present case, destroy the manufacturer's option under FMVSS 208. Thus, the court reasoned, the passive restraint claims would interfere with the "methods by which the federal statute was designed to reach" its primary goal. *Kolbeck*, 702 F.Supp. at 541–42 (citing *Ouellette*, 479 U.S. at 494, 107 S.Ct. at 813). Other courts have also found preemption on this basis. *See, e.g., Taylor v. General Motors Corp.,* 875 F.2d 816 (11th Cir.1989). *Kolbeck* also notes that the issue is "extremely close." 702 F.Supp. at 541–2. While we are not unmindful of the potential economic impact upon Audi on an issue that has seen much controversy, we are more comfortable with our delineation. Obviously, we disagree with the holding of *Kolbeck* for the reasons already stated and to be instantly discussed.

intent to work such an alteration. The Supreme Court has often counselled such hesitance." *Ferebee,* 736 F.2d at 1543 (emphasis in the original; further citation omitted). *See also Silkwood,* 464 U.S. 238, 104 S.Ct. 615. The logic of this distinction is set forth in the seminal case interpreting the Act, *Larsen,* 391 F.2d at 506:

> It is apparent that the National Traffic Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability. The common law is not sterile or rigid and serves the best interests of society by adapting standards of conduct and responsibility that fairly meet the emerging and developing needs of our time. The common law standard of a duty to use reasonable care in light of all the circumstances can at least serve the needs of our society until the legislature imposes higher standards or the courts expand the doctrine of strict liability for tort. The Act is a salutary step in this direction and not an exemption from common law liability.

*See also* Restatement (Second) of Torts § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.").

Moreover, we must not lose our procedural bearings. A finding of no federal preemption merely allows Gingold to raise her passive restraint claims at trial. This by no means insures that she will prevail. It is not inconceivable that a jury could reject the claims. Therefore, Audi's dire prognostication that our decision will force all automobile manufacturers to install passive restraints in their new vehicles, and perhaps even institute a recall for such installation, seems somewhat hyperbolic. The underlying issue is not whether the vehicle did or did not have air bags or other passive restraints, but whether the vehicle was defectively designed. A jury could find that the manner in which Audi complied with FMVSS 208 rendered the vehicle's occupant restraint system adequate. Regardless, the only issue be-

fore us is whether Congress intended that such issues go before juries. It did. Congress articulated this intent in section 1397(c).

█ Audi argues further, however, that by depriving a manufacturer of the full range of options provided by FMVSS 208 and section 1410b (by permitting passive restraint claims to go before a jury), the "full purposes and objectives of Congress" would be frustrated. This argument, however, is fallacious. First, as we stated previously, common law claims do not prevent a manufacturer from complying with the federal standards nor do they strip a manufacturer of any option under any standard. A common law claim is not a regulatory command. Second, Audi's argument is misleading. It is based upon language articulated by the Supreme Court in many preemption analyses which provides that state law is nullified when state law stands as an obstacle to the attainment of the "full purposes and objectives of Congress." *See, e.g., Louisiana Public Service Commission*, 476 U.S. at 368–69, 106 S.Ct. at 1890; *de la Cuesta*, 458 U.S. at 153, 102 S.Ct. at at 3022. Audi, however, takes this language out of context.[19] The "sole task" in any preemption analysis is to determine Congress's intent. If that intent is not expressly stated in the legislation or regulations, it may be implied. *See, e.g., de la Cuesta*, 458 U.S. at 153, 102 S.Ct. 3022. Preemption may be implied when Congress completely occupies a given field, leaving no room for the states to act. Absent such total displacement of state regulation, preemption will also be implied when (1) compliance with both federal and state law is a "physical" impossibility, or (2) "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). The flaw in Audi's argument is that, in the case before us, Congress has *expressly* articulated its intent

**19.** Audi is not alone in this regard. Some courts finding preemption of passive restraint claims under the Act have also taken this language out of context. *See, e.g., Taylor*, 875 F.2d 816; *Kolbeck*, 702 F.Supp. 532.

to preserve actions at the common law notwithstanding any compliance with the FMVSS. 15 U.S.C. § 1397(c). Therefore, we need not reach to doctrines designed to aid a court in determining whether Congress, by passage of its legislation, intended to preempt state action by *implication.* An implied preemption analysis should not be entertained in the face of Congress's express pronouncement of its intent regarding preemption. *See Schwartz,* 554 So.2d at 936–937 (Hornsby, C.J., concurring and dissenting).

Our construction of the above preemption analysis is supported by the analysis of the U.S. Supreme Court in *Guerra,* 479 U.S. 272, 107 S.Ct. at 683. In *Guerra,* a worker returning to her employment after a pregnancy leave found her position filled. A state statute, however, required employers to provide pregnancy leave and reinstate returning workers. The employee filed a complaint under this statute. The employer thereupon filed a separate action in District Court arguing that the state statute was preempted by the Civil Rights Act. The employer claimed that the state statute either made it impossible for an employer to comply with both the federal and state laws, or it stood as an obstacle to the full purposes and objectives of Congress. The Supreme Court stated: "In two sections of the 1964 Civil Rights Act, §§ 708 and 1104, Congress has indicated that state laws will be pre-empted only if they actually conflict with federal law.[20] ... Accordingly, there

20. Section 708 of the Civil Rights Act provides:
> Nothing in this title shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this title.

Section 1104 provides:
> Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provi-

is no need to infer congressional intent to pre-empt state laws from the substantive provisions of Title VII; these two sections provide a 'reliable indicium of congressional intent with respect to state authority' to regulate employment practice." 479 U.S. at 282, 107 S.Ct. at 690 (citation omitted). In a concurrence, Justice Scalia went further to state that sections 708 and 1104 of the Civil Rights Act "are described by the majority as pre-emption provisions, they are more precisely *antipre-emption* provisions, prescribing that nothing in Title VII (in the case of § 708) and nothing in the entire Civil Rights Act (in the case of § 1104) shall be deemed to preempt state law unless certain conditions are met." 479 U.S. at 295, 107 S.Ct. at 697–98 (emphasis in the original). Similarly, the Act contains an anti-preemption provision in section 1397(c), obviating any need to determine whether Congress intended this legislation to be preemptive. *Accord California Coastal Commission v. Granite Rock Company*, 480 U.S. 572, 593, 107 S.Ct. 1419, 1431, 94 L.Ed.2d 577 (1987). *See also Philadelphia Housing Authority*, 508 Pa. at 581, 499 A.2d at 297 ("A principle of statutory construction is only an aid in determining legislative intent and will not be permitted to change the clear meaning of a legislative mandate").

In the context of this argument, Audi attempts to demonstrate that the present case is controlled by *de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014. *de la Cuesta* involved a conflict between a federal banking regulation permitting "due-on-sale" mortgage clauses and California law which rendered such clauses unenforceable. The Supreme Court found the California law to be preempted, despite the fact that the Federal Home Loan Bank Board ("Board") did not mandate due-on-sale clauses by its regulation but provided only that they would remain an option for savings and loan mortgagees. Audi cites the following language to be pertinent:

> sion is inconsistent with any of the purposes of this Act, or any provision thereof.

> The conflict does not evaporate because the Board's regulations simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts.... The Board consciously has chosen not to mandate use of due-on-sale clauses "because [it] desires to afford associations the flexibility to accommodate special situations and circumstances." ... [T]he California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely "at its option" and have deprived the lender of the "flexibility" given by the Board.

458 U.S. at 155, 102 S.Ct. at 3023 (citations and footnote omitted). What Audi does not address, however, is that the Court found preemption because of the Board's *expressly* stated intention to preempt state law with respect to due-on-sale clauses. See 458 U.S. at 158–159, 102 S.Ct. at 3025–3026. The above-quoted language merely demonstrates that the conflict between state and federal law, required before there can be any question of preemption, exists even when a federal regulation does not mandate a result but only provides an option. Thus, *de la Cuesta* is inapposite.[21] See also *Kolbeck*, 702 F.Supp. at 539 ("In reaching its conclusion that the regulation preempted any contrary state law, the Court [in *de la Cuesta*] emphasized the clear intent of the Board in promulgating the regulation to preempt any conflicting state law as evidenced by the preamble accompanying and explaining the regulation. Nothing in the legislative history of the ... Act or in FMVSS 208 provides a clear statement that any safety standard was designed to

21. We engage in this analysis of *de la Cuesta* because other courts have used this case, we think wrongly, as a basis for finding preemption on the grounds essentially advanced here by Audi. See *Taylor,* 875 F.2d at 827 ("*de la Cuesta* governs this case. It holds that a state common law rule cannot take away the flexibility provided by a federal regulation, and cannot prohibit the exercise of a federally granted option."). This is not the holding of *de la Cuesta.* Like all preemption cases before the Supreme Court, *de la Cuesta* stands for the proposition that the touchstone for any preemption analysis is the intent of Congress (or its duly authorized regulatory agency acting within the scope of the legislation). See 458 U.S. at 152–3, 102 S.Ct. at 3022.

preempt a common law product liability claim." (citation omitted)).

Finally, Audi argues that Gingold's passive restraint claims are preempted because they would serve to destroy "the uniformity and flexible regulatory process Congress established by the ... Act." This argument is based upon a purpose of the Act, expressed in the legislative history and to an extent by section 1392(d)[22], that the safety standards be uniform. "[The nature] of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but they be uniform throughout the country." S.Rep. No. 1301, at 12, U.S.Code Cong. & Admin. News 1966, 2720.

It is apparent, however, that the primary goal of the Act is to reduce traffic accidents and injuries on the highways. *See* 15 U.S.C. § 1381 and cases cited *supra* interpreting this section. Uniformity of safety standards is a goal articulated in the legislative history but not one articulated in the Act itself, as is the goal to promote highway safety. Moreover, the Act articulates a clear purpose to provide for common law remedies despite a manufacturer's adherence to the safety standards. 15 U.S.C. § 1397(c). The Supreme Court has "refused to preempt a State's law, even when it is contrary to subsidiary objectives concerning administration, if the State's law furthers the federal statute's primary purpose and is consistent with the Act's saving of State's authority in an area traditionally regulated by States." *Ouellette,* 479 U.S. at 505, 107 S.Ct. at 818 (Brennan, J., concurring and dissenting). *See also Pacific Gas & Electric Co.,* 461 U.S. at 221–23, 103 S.Ct. at 1731–1732.[23]

**22.** Section 1392(d) does not provide for absolute uniformity of standards. This section permits the Federal Government or the government or political subdivision of any state to impose higher standards of performance for vehicles of its own use.

**23.** In *Pacific Gas,* the Court was asked to consider whether a California statute, which places a moratorium on certification of new nuclear power plants within the state until a state commission is satisfied that there shall be available the means for permanent and terminal disposal of high-level nuclear wastes, is preempted because it conflicts

The allowance of common law passive restraint claims is completely consistent with the plain language of section 1397(c) of the Act and is also consistent with the articulated purpose of the Act, to promote safety. Tort actions can lead to greater insights into the inherent hazards or shortcomings of existing occupant restraint systems and test the public's acceptance of new systems through jury verdicts. Moreover, "the specter of damage actions may provide manufacturers with added dynamic incentives to continue to keep abreast of all possible injuries stemming from the use of their product so as to forestall such actions through product improvement." *Ferebee,* 736 F.2d at 1541–42. *See also Schwartz,* 554 So.2d at 945 (Hornsby, C.J., concurring and dissenting). Viewed in this manner, section 1397(c) is in complete harmony with the purpose of the Act as set forth in section 1381.[24]

with a goal of the Atomic Energy Act to promote and encourage the development of atomic energy. Accordingly, it was argued that the California statute stood as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The Atomic Energy Act, however, provided a savings clause for state action. This is discussed in the Court's holding:

Moreover, Congress has allowed the States to determine—as a matter of economics—whether a nuclear plant vis-a-vis a fossil fuel plant should be built. The decision of California to exercise that authority does not, in itself, constitute a basis for pre-emption. Therefore, while the argument of petitioners and the United States has considerable force, the legal reality remains that Congress has left sufficient authority in the States to allow the development of nuclear power to be slowed or even stopped for economic reasons. Given this statutory scheme, it is for Congress to rethink the division of regulatory authority in light of its possible exercise by the States to undercut a federal objective. The courts should not assume the role which our system assigns to Congress.

461 U.S. at 222–23, 103 S.Ct. at 1731–1732 (footnotes omitted).

24. Therefore, it follows that a preemption of state common law claims is at odds with the purpose of the Act, giving strong argument against preemption even if there was not a savings clause. We find the following comments from the Texas Court of Civil Appeals (now Texas Court of Appeals) enlightening: "Finally, the argument that a single jury verdict may have profound consequences disrupting an essential industry has been characterized as contending that the desirability of immunity from liability is directly proportional to the magnitude of the risk created." *Turner v. General Motors Corp.,* 514 S.W.2d 497, 506 (Tex.Civ.App.1974). Further, as one other court has stated, "Congress intended the Act to save the lives of automobile

At any rate, in the face of a clear intention by Congress to save common law actions despite a manufacturer's compliance with any FMVSS, we cannot give precedence to a subsidiary purpose *read into* the Act.

> [A] Congressional purpose gleaned from one statement in the legislative history of a statute [the statement concerning uniformity we have quoted above] does not provide an adequate foundation to support a finding of preemption based on "interference with the achievement of the 'full purposes and objectives of Congress.'" Particularly where a savings clause has been interpreted to preserve common law actions for failing to exceed the safety standards promulgated by the Secretary, I am unwilling to conclude that any interest in national uniformity of design standards, standing alone, predominates over the purposes expressly included in the ... Act by adoption of section 1397(c).

*Kolbeck,* 702 F.Supp. at 539 (citations omitted).

Further,

> Congress, however, made it perfectly clear that its primary objective was promoting safety; indeed, the face of the Act reveals no other purpose. To subordinate the safety objective to the concern for uniformity is to obfuscate it. In my view, the common law could well promote the safety objective, *within* the confines of [FMVSS] 208. To toss out this lawsuit because, if the plaintiffs prevail, it would frustrate the purpose of uniformity is to read into the Act what the words of the Act forbid. The common law, stifled, cannot possibly further the safety objective where it is displaced by an unspoken uniformity purpose.

*Schwartz,* 554 So.2d at 944–945 (Hornsby, C.J., concurring and dissenting; emphasis in the original).

Moreover, we find the following language of the U.S. Supreme Court in *Silkwood,* 464 U.S. at 256, 104 S.Ct. at

passengers through safety standards; not the dollars of automobile manufacturers through uniformity." *Garrett,* 684 F.Supp. at 409.

625 concerning the effect of state common law claims for injuries arising from nuclear incidents upon the goals of the Atomic Energy Act, to be an appropriate response to Audi's arguments that passive restraint claims frustrate certain purposes of and procedures under the Act:

> In sum, it is clear that ... Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But ... Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that an award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

Accordingly, we reject Audi's argument that Gingold's passive restraint claims are preempted because they would destroy uniformity among the FMVSS.

The touchstone to any preemption analysis is congressional intent. *Guerra*, 479 U.S. 272, 107 S.Ct. 683. While all of the courts which have reviewed the preemption issue regarding passive restraints have started from this position, we feel that those which have found preemption lost their bearings in the labyrinthine ways of argument and in the maze of statutory construction. Within this maze, cases finding preemption have unintentionally vitiated that which they had set out to support—congressional intent. We think that intent is adequately set forth in section 1397(c) of the Act. Nothing else in the Act or its history is of sufficient force or character to justify a disregard of the plain language of this section. Moreover, nothing in the

Act or the FMVSS demonstrates the "clear and manifest" intent of Congress that common law passive restraint claims were to be preempted. *ARC America Corp.*, 490 U.S. at —— and ——, 109 S.Ct. 1665–1666 and 1667, 104 L.Ed.2d at 94 and 97; *Rice*, 331 U.S. at 218, 67 S.Ct. at 1146. Accordingly, because we hold that the Act does not preempt passive restraint claims, including "no air bag" claims, we reverse that part of the trial court's order which precludes Gingold from alleging that the vehicle was defective because an air bag system was not installed or from offering any evidence of alternative seat belt designs or other passive restraints.[25]

### IV. Remaining Claims

Audi raises two other issues on appeal. First, Audi argues that Gingold's passive restraint claims are preempted by 75 Pa.Con.Stat.Ann. § 4103(b). This section provides:

Federal standards promulgated with respect to the performance of any vehicle or item of equipment shall have the same force and effect as if promulgated by the [Department of Transportation of the Commonwealth] under subsection (a) and shall supersede any Commonwealth standard applicable to the same aspect of performance for the vehicle or item of equipment.

Second, Audi argues that Gingold's passive restraint claims should not be recognized as a cause of action under Pennsylvania law. Audi contends that such claims do not state that the vehicle had an unreasonably dangerous design defect.

While Audi argued each of these issues before the trial court, the trial court did not address them. Rather, the substance of the trial court's opinion and order concerned

**25.** We note once again that the trial court's order of May 12, 1988 on its face only dismisses Audi's motion for partial summary judgment. As outlined in footnote 4 above, however, the trial court's complete disposition also held that "no air bag" claims and Gingold's passive restraint claims were preempted by federal law and that Gingold was precluded from alleging that the vehicle was defective because an air bag system was not installed or from offering any evidence of alternate seat belt designs. It is this particular aspect of the trial court's disposition, incorporated into the trial court's order, that we reverse.

only the federal preemption issue. The federal preemption issue was the only issue the trial court certified for permissive interlocutory appeal to this court pursuant to 42 Pa. Con.Stat.Ann. § 702(b). *See* trial court's order of June 7, 1988 at footnote 4. Accordingly, this was the sole issue for which we granted permissive appeal by our order of July 12, 1988.[26]

 This court has no discretion to hear an appeal from an interlocutory order which has not been authorized by law or certified by the trial court under 42 Pa.Con.Stat. Ann. § 702(b). *See Gurnick v. Government Employees Insurance Company*, 278 Pa.Super. 437, 420 A.2d 620 (1980) (Hoffman, J., dissenting), *and Toll v. Toll*, 293 Pa.Super. 549, 439 A.2d 712 (1981) (adopting Judge Hoffman's dissent in *Gurnick*), *aff'd*, 498 Pa. 536, 448 A.2d 1379 (1982). Pursuant to section 702(b), the trial court must certify that its interlocutory order presented a "controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate determination of the matter." 42 Pa.Con.Stat.Ann. § 702(b). The permission of appeal from a certified order rests in the appellate court's discretion. *Id. See also Toll*, 293 Pa.Super. 549, 439 A.2d 712.

The trial court did not certify any issue other than that of federal preemption for permissive appeal pursuant to section 702(b). While the other issues raised by Audi are related to this issue to one degree or another, they were not certified for permissive appeal nor do they appear to represent controlling questions of law for which there are substantial grounds for differences of opinion. Accordingly, we do not believe that this court's order of July 12, 1988 permits review of these issues.

**26.** Our order stated: "AND NOW, this 12th day of July, 1988, the Petition for Permission to Appeal is Granted from the Order dated June 7, 1988 certifying the trial court's order of May 12, 1988."

## V. Conclusion.

For the foregoing reasons, we affirm and reverse the order of the trial court. We affirm the court's denial of Audi's motion for partial summary judgment, but we reverse that portion of the trial court's order which precludes Gingold from presenting evidence that the vehicle was defective because of an absence of air bags, alternative seat belt designs, or other passive restraints. Jurisdiction relinquished.