666 A.2d 1066

**Dennis Bradley HEIPLE**

v.

**C.R. MOTORS, INC., and General Motors Corporation.**

**Appeal of GENERAL MOTORS CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 13, 1994.

Filed Oct. 13, 1995.

312

Leslie G. Landau, San Francisco, CA, for appellant.

Michael N. Vaporis, Indiana, for Dennis B. Heiple, appellee.

Before DEL SOLE, FORD ELLIOTT and BROSKY, JJ.

FORD ELLIOTT, Judge:

In this appeal from the trial court's denial of its preliminary objections,[1] appellant General Motors Corporation asks us to revisit our decision in *Gingold v. Audi–NSU–Auto Union, A.G.,* 389 Pa.Super. 328, 567 A.2d 312 (1989), *reargument denied,* February 20, 1990. Appellant argues that *Pokorny v. Ford Motor Co.,* 902 F.2d 1116 (3rd Cir.1990), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990), in which the Third Circuit Court of Appeals declined to follow *Gingold,* compels us to overrule it. We disagree, finding instead that the U.S. Supreme Court's decisions in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407

---

1. While the subject appeal from the denial of preliminary objections is an appeal from an interlocutory order, the trial court found that the issue addressed in the preliminary objections presented a controlling question of law as to which there was a substantial basis for difference of opinion, and that an appeal from the order would therefore materially advance the ultimate termination of the case. As a result, the trial court certified the order for interlocutory appeal pursuant to Pa.R.A.P. Rule 1311. (Order of court, 12/6/93.) This court thereafter granted appellant's Petition for Permission to Appeal on May 18, 1994.

(1992), and *Freightliner Corp., et al. v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (*Myrick II* ), support our holding in *Gingold.* As a result, we affirm.

We note first that our review of the trial court's denial of appellant's preliminary objections is plenary, as appellant has raised a controlling question of law. *See Mazaika v. Bank One, Columbus, N.A.,* 439 Pa.Super. 95, 98, 653 A.2d 640, 641–42 (1994) (scope of review of "an order sustaining preliminary objections in the nature of a demurrer is plenary, and, after accepting as true all material facts set forth in the complaint as well as all inferences reasonably deducible therefrom, we determine whether, on the facts averred, the law precludes with certainty a recovery by plaintiff."). A summary of the facts of this case, taken from the trial court opinion, therefore follows:

On October 10, 1991, Plaintiff, Dennis Bradley Heiple, was involved in a head-on collision with another motor vehicle. At the time of the collision, Plaintiff was operating a 1986 Chevrolet Celebrity automobile, which was manufactured by G[eneral] M[otors] and ultimately sold by CR Motors, Inc. Thereafter, Plaintiff filed a Complaint, seeking to recover damages for injuries he allegedly suffered in the collision. In this Complaint, Plaintiff's cause of action was based on the allegation that his seat belt malfunctioned as a result of a defect which existed at the time the automobile was manufactured and sold.

On June 28, 1993, Plaintiff filed a Motion for Leave to Amend his Complaint, seeking to add a new paragraph alleging that the vehicle was defective because it did not contain an air bag. GM opposed the Motion for Leave to Amend, maintaining that claims based on the failure to install an air bag are preempted by the National Traffic and Motor Vehicle Safety Act of 1966 (hereinafter the 'Safety Act'), 15 U.S.C.A. § 1381, *et,* [sic] *seq.,* and the Federal Motor Vehicle Safety Standards promulgated thereunder, 49 C.F.R. § 571.208 (hereinafter 'FMVSS 208'). By Opinion and Order dated August 20, 1993, this Court granted Plain-

tiff's Motion for Leave to Amend, thus allowing Plaintiff to add the claim based on the absence of an air bag.

Shortly thereafter, on August 27, 1993, Plaintiff filed an Amended Complaint, adding the absence of an air bag claim in paragraph 11. GM then filed the Preliminary Objections . . . [that are the subject of this appeal], maintaining that the claim based on the failure to install an air bag is legally insufficient due to the preemptive effect of the Safety Act and FMVSS 208. Plaintiff responded to these Objections by claiming that the Court's Opinion and Order of August 20, 1993 is dispositive, in that GM supports its current Objections with the identical arguments put forth in opposition of [sic] Plaintiff's Motion for Leave to Amend. . . .

Trial court opinion, 12/6/93 at 1–2.

We will begin our analysis by recognizing that the circuit courts of appeals of the United States, as well as the various state appellate courts that have been confronted with the issue before us, have come to sharply varying conclusions. *See Gingold, supra* at 334 n. 6, 567 A.2d at 315 n. 6. We also recognize that, prior to *Cipollone, supra,* the position adopted by the *Gingold* court was a minority position. *Gingold, supra* at 334 n. 6, 567 A.2d at 315 n. 6. Nevertheless, we are persuaded by the careful analysis of the *Gingold* court as harmonized with the U.S. Supreme Court's recent pronouncements on the preemption issue. Before reaching that analysis, however, a brief summary of the relevant case law is appropriate.

### *Gingold v. Audi–NSU–Auto Union, A.G.*

In 1989, this court decided *Gingold, supra,* a case in which appellant brought wrongful death and survival actions against a driver, McCloskey, and against the manufacturer of the car decedent was driving, Audi–NSU–Auto Union, Inc. (Audi), as a result of the death of her husband in a motor vehicle accident. The accident occurred when McCloskey rear-ended decedent, who was stopped at a red light, at approximately 50 miles per hour. The impact caused McCloskey's car and Gingold's car to travel together for 44 feet until Gingold's car separated and hit a tree at approximately 25 miles per hour.

The Audi was equipped with a manual three-point seat belt, which Gingold was wearing at the time of the accident, but was not equipped with any passive restraints, including air bags.[2] The physician who performed the post mortem examination determined that Gingold died as a result of the frontal collision, which caused him to be thrown forward into the steering wheel. Gingold sustained fatal facial injuries, brain damage, and injury to the spinal cord from that impact. *Id.* at 329–32, 567 A.2d at 313–314.

Appellant alleged negligence, products liability and breach of warranty against Audi, and negligence against McCloskey. The basis for appellant's products liability claim was that Audi had defectively designed the car decedent was driving because it had failed to install passive restraints. Audi responded with a motion for partial summary judgment, claiming that the passive restraint claims were preempted by the Safety Act and FMVSS 208, and that state law barred appellant's claims. *Id.* at 330–32, 567 A.2d at 314. At the time *Gingold* was decided, the Safety Act had an express preemption clause and a savings clause. The express preemption clause provided:

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. . . .

15 U.S.C. § 1392(d). The savings clause stated:

Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law.

**2.** An automobile passive restraint system is a system which does not require any action by the occupant in order to be effective, and would include devices such as air bags, which are deflated bags stored under the dashboard or in the steering wheel of an automobile that inflate very rapidly when the car suddenly decelerates or upon a specific impact to the car, and automatic seat belts, which move into place automatically when the passenger sits in a seat and closes the door. *Gingold, supra* at 331 n. 2, 567 A.2d at 314 n. 2 (citations omitted).

15 U.S.C. § 1397(c).[3] In addition, when the Audi was manufactured in 1983, FMVSS 208 provided that automobile manufacturers could opt for one of three systems: (1) a complete passive restraint system for front and lateral crashes; (2) passive restraints for frontal crashes plus lap belts, shoulder harnesses, and a warning system; or (3) a 3–point manual seat belt with a warning system. *Id.* at 336–38, 567 A.2d at 317, *citing* 49 C.F.R. §§ 571.208 S4.1.2.1, S4.1.2.2, and S4.1.2.3; *Taylor v. General Motors Corp.*, 875 F.2d 816, 823 (11th Cir.1989), *citing* 49 C.F.R. § 571.208 (1977) & (1980). The third alternative was the choice of Audi and the overwhelming majority of other auto manufacturers. *Id. See also* Richard Goodman, *Automobile Design Liability* 2d, § 1:7, 16 (2d ed. 1983) (Goodman) ("[T]he only manufacturer offering air bags in 1983 [was] Mercedes–Benz. And that [was] a driver-side only system offered for sale in models sold in Europe. The only time that air bags were offered for sale in the United States was in 1974–75 under the leadership of Edward Cole, the last engineer to be the president of General Motors.").

**3.** § 1397(c) became § 1397(k) in 1988. We will, therefore, refer to the section as § 1397(k) throughout this opinion. We note, however, that both 1392(d) and 1397(k) were repealed in July 1994 and were recodified at 49 U.S.C. §§ 30103(b) and (e) respectively, as follows:

(b) Preemption.—

(1) When a motor vehicle safety standard is in effect under this chapter, a State or political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter. However, the United States Government, a State, or a political subdivision of a State may prescribe a standard for a motor vehicle or motor vehicle equipment obtained for its own use that imposes a higher performance requirement than that required by the otherwise applicable standard under this chapter.

(2) A state may enforce a standard that is identical to a standard prescribed under this chapter.

. . . .

(e) Common law liability.—Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law.

This recodification was approved April 17, 1995. The Historical and Statutory Notes indicate that changes in the wording were made for the purposes of consistency and clarity, and to avoid superfluity.

The trial court effectively granted Audi's motion, finding that common law "no air bag" claims were preempted by the federal regulation. *Gingold, supra* at 330–32, 567 A.2d at 314. On appeal, this court first noted the standard for preemption:

> Congress is empowered to preempt state law by the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution.... Thus, preemption ' "is compelled [when] Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." ' ...
> When Congress does not expressly state its intent to preempt state law, its intent to supercede state law 'may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary regulation.'

*Id.* at 338–39, 567 A.2d at 318 (citations omitted). Applying this standard to the issue before us, we held that appellant's common law claims were expressly *not* preempted.[4] Then, in language presaging *Cipollone*,[5] we held that "an implied preemption analysis should not be entertained in the face of Congress's express pronouncement of its intent regarding preemption." *Id.* at 356, 567 A.2d at 327. Finding no express preemption of state common law liability, and no basis for engaging in implied preemption analysis, therefore, this court reversed that portion of the trial court's order finding that appellant's design defect claims were preempted. *Id.* at 363–65, 567 A.2d at 331.

### Pokorny v. Ford Motor Co.

*Gingold* was followed one year later by *Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3rd Cir.1990), the case upon which appellant GM relies. In *Pokorny*, a police officer was crushed to death by a van in which he was a passenger when the van rolled over during a collision. The officer was partially eject-

---

4. For a discussion of the distinction between the holding of the *Gingold* court that common law actions were *expressly not preempted* by the Safety Act, and the holding of the Third and Eleventh Circuit courts that common law actions were *not expressly preempted* by the Act, see *infra* at n. 15.

5. See discussion *infra*.

ed through the window of the van at the time it rolled. The van, a 1981 model Ford, was equipped with a three-point safety belt and warning buzzer in compliance with FMVSS 208; however, the officer was not wearing the belt at the time of the crash. *Id.* at 1118–19. Pokorny, who was administratrix of the officer's estate, brought an action in Pennsylvania state court against Ford, claiming negligence, strict liability and breach of implied warranties because Ford failed to install passive restraints in the van. *Id.* at 1118. Ford moved to have the case removed to federal court based upon diversity jurisdiction, and then moved for summary judgment on all counts. The district court found implied preemption, concluding that Pokorny's action created a conflict with the options provided manufacturers under FMVSS 208. As a result, the district court granted Ford's motion for summary judgment on all counts. *Id.* at 1119.

On appeal, the Court of Appeals for the Third Circuit noted:

[F]ederal pre-emption of state law can occur in three types of situations: where Congress explicitly pre-empts state law, where pre-emption is implied because Congress has occupied the entire field and where pre-emption is implied because there is an actual conflict between federal and state law.

*Id.* at 1120, *citing Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). The Third Circuit then engaged in a well-reasoned analysis of express preemption principles, and held that appellant's common law actions were not expressly preempted by the Safety Act.[6] Having found no express preemption, the court then engaged in an implied preemption analysis. As the court noted, federal law may preempt state law, *inter alia,* "to the extent that the state law conflicts with a federal regulatory scheme." *Id.* at 1122. Applying that rule to the issue before it, the court then found implied preemption based upon a perceived conflict

6. See discussion, *infra* at n. 15 for a discussion of the distinction between the *Pokorny* court's express preemption holding and the holding of the *Gingold* court on that issue.

between state common law causes of action and the options provided manufacturers by FMVSS 208. *Id.* at 1123.

We note, however, that *Pokorny* was decided without the benefit of the Supreme Court's decision in *Cipollone, supra.* We will therefore turn next to *Cipollone* for instruction.

### *Cipollone v. Liggett Group, Inc.*

Petitioner in *Cipollone* was the son of a woman who smoked for over forty years before developing lung cancer. In his claim [7] against the cigarette manufacturers, petitioner alleged five categories of claims: breach of express warranty, based upon respondents' assurances that smoking did not present any major health consequences; fraudulent misrepresentation, based upon respondents' attempts through their advertising to neutralize the effect of federally mandated warning labels on packages of cigarettes; conspiracy to deprive the public of scientific and medical information about the effects of smoking on health; design defect, based upon respondents' failure to use safer alternative designs for their products where the social value of their product was outweighed by the harm it caused; [8] and failure to warn of the hazards of smoking, based upon respondents' failure to provide adequate warnings of the effects of smoking on health, and based upon respondents' negligence in their testing, research, selling, promotion and advertising of their product. *Id.* at 506–09, 112 S.Ct. at 2613, 120 L.Ed.2d at 416–18.

Respondents raised the defense of preemption, arguing that the Federal Cigarette Labeling and Advertising Act of 1965 and the Public Health Cigarette Smoking Act of 1969 [9] which

7. Suit was originally filed by petitioner's mother, Rose Cipollone. After she died in 1984, her husband filed an amended complaint. Husband died after trial, and their son, as executor of both estates, continued the action.

8. The Supreme Court was not presented with any question regarding the design defect claims, so they were not addressed. *See Id.* at 512 n. 6, 112 S.Ct. at 2615 n. 6, 120 L.Ed.2d at 420 n. 6.

9. Pub.L. 89–92, 79 Stat. 282, as amended, 15 U.S.C. §§ 1331–1340; and Pub.L. 91–222, 84 Stat. 87, as amended, 15 U.S.C. §§ 1331–1340, respectively.

followed protected them from common law liability after 1965. The District Court, concluding that the federal statutes did not preclude common law liability, granted petitioner's motion to strike the preemption defense entirely. *Id.* at 509–11, 112 S.Ct. at 2614, 120 L.Ed.2d at 418–20. On appeal, the Third Circuit rejected respondents' express preemption argument, but found that common law actions were impliedly preempted because they would conflict with federal law. Relying upon the purpose of the statutes at issue, the court concluded that common law actions would disturb the delicate balance Congress intended to create between the public's right to know about the hazards of smoking and the "interests of the national economy." *Id.* at 511, 112 S.Ct. at 2614–15, 120 L.Ed.2d at 419.

Following trial, the case eventually reached the Supreme Court, which briefly reviewed the law of preemption as delineated *supra.* Then, in language completely in harmony with *Gingold, supra,*[10] the Court held:

> When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' ... 'there is no need to infer congressional intent to preempt state laws from the substantive provisions' of the legislation.

*Id.* at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423, *citing Malone v. White Motor Corp.,* 435 U.S. 497, 505, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443, 451 (1978); *California Federal Savings & Loan Assn. v. Guerra,* 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.). Since both of the statutes in question, the 1965 and 1969 versions of the Act, contained preemption provisions,[11] the Court determined that its sole task was to identify the "domain expressly pre-empted by each of those sections." *Id.* There was no need to engage

10. See discussion of *Gingold, supra,* anticipating *Cipollone*'s holding.

11. The text of these provisions, as well as a more detailed discussion of the Court's analysis of them, can be found *infra,* in our discussion of appellant's first argument on appeal.

in implied preemption analysis. The Court then scrutinized each of petitioner's common law claims to determine which were, and which were not, preempted by the express language of the statutes.

To aid in its analysis of the statutes, the Court employed several presumptions and tools of statutory construction, the first of which was the presumption against preemption. As the Court stated:

> Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'

*Cipollone, supra* at 516, 112 S.Ct. at 2617, 120 L.Ed.2d at 422, *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The *Cipollone* court continued:

> [W]e must construe these [preemption] provisions in light of the presumption against the preemption of state police power regulations.

*Cipollone, supra* at 518, 112 S.Ct. at 2618, 120 L.Ed.2d at 424. Next, the Court in *Cipollone* noted that, where Congress has spoken on the issue of preemption, there is no need to infer congressional intent to preempt state law because of the "familiar principle of *expression* [sic] *unius est exclusio alterius:* [12] Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone, supra* at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423. Applying the presumption against preemption and the aforementioned rule, the Court then noted that a "narrow reading" of the preemption provisions was, therefore, appropriate. *Id.*

As a result of its analysis, the Court found that none of petitioner's common law claims was preempted by the 1965 Act. *Id.* at 517–21, 112 S.Ct. at 2618–19, 120 L.Ed.2d at 423–25. Because the language in the 1969 Act swept more broadly, however, the Court found that some of petitioner's common

12. The expression of one thing is the exclusion of another.

law claims were preempted, but that others were not. In particular, the Court found that petitioner's claims for conspiracy to defraud, fraudulent misrepresentation, and express warranty were not preempted, while the claims based upon failure to warn were preempted to the extent that they relied upon "omissions or inclusions in respondents' advertising or promotions[.]" *Id.* at 531, 112 S.Ct. at 2625, 120 L.Ed.2d at 432.

## *Myrick v. Freuhauf Corp. (Myrick I)*

Following the Supreme Court's decision in *Cipollone* in 1992, many courts of appeals embarked upon a reevaluation of their preemption analyses. Among them was the Eleventh Circuit Court of Appeals, which faced a preemption question in the context of the Safety Act in *Myrick v. Freuhauf Corp.*, 13 F.3d 1516 (11th Cir.1994) (*Myrick I* ). A brief review of the *Myrick* facts is therefore appropriate at this time.

In *Myrick I*, two claims were consolidated, one in which plaintiff was injured and one in which plaintiff's decedent was killed. Both accidents were caused by tractor-trailer rigs that jackknifed. In both cases, claimants alleged that the rigs were negligently designed because they were not equipped with anti-lock brakes. The FMVSS in effect at that time gave manufacturers "a choice of whether to install anti-lock brakes." *Myrick I, supra* at 1519–20. As a result, the truck manufacturers argued that the state common law actions brought by claimants were preempted. In resolving this issue, the *Myrick I* court was required to apply the Supreme Court's holding in *Cipollone, supra* that, in the presence of preemption language in a statute which provides a reliable indicium of congressional intent, "there is no need to infer congressional intent to preempt state laws from the substantive provisions." *Cipollone, supra* at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423. In doing so, the Court felt compelled to abrogate prior Eleventh Circuit decisions interpreting the Safety Act, specifically *Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989).

In *Taylor*, the Eleventh Circuit was confronted with two consolidated "air bag" cases, in which the personal representatives of two individuals who died in automobile accidents brought actions against the automobile manufacturers under a strict products liability theory, claiming that the automobiles were defective because they were not equipped with air bags. *Taylor, supra* at 817. The auto manufacturers sought to dismiss the complaints, claiming that the Safety Act and FMVSS 208 preempted state common law liability. As a result, the Eleventh Circuit engaged in traditional, pre-*Cipollone* preemption analysis, first addressing the manufacturers' argument that state tort liability was expressly preempted. *Id.* at 823.

The *Taylor* court first noted that the manufacturers' interpretation of the Safety Act would "render an entire section of the Safety Act superfluous" by giving practically no effect to § 1397(k). *Id.* at 824. Next, the court found that Congress' failure explicitly to mention state common law liability in the Act's preemption clause rendered the manufacturers' express preemption analysis doubtful. *Id.* The court thus found that state common law liability was not expressly preempted. But then, like the Third Circuit in *Pokorny*, the court turned next to the manufacturers' argument that state liability was impliedly preempted. After engaging in a traditional implied preemption analysis in which the court examined the effect of a state claim on the federal statute, the *Taylor* court then found that state common law liability was impliedly preempted. With the holdings of *Taylor* and *Cipollone* before it, the *Myrick I* court thus felt compelled to follow *Taylor* insofar as it held that state tort actions were not expressly preempted by the Safety Act, but constrained by *Cipollone* from following *Taylor*'s implied preemption analysis. *Myrick I, supra* at 1521.

Despite the clear holding of *Cipollone*, the auto manufacturers and their *amici* in *Myrick I* argued that implied preemption analysis was still permissible, even when a statute such as the Safety Act contained an express preemption provision. In response to this argument, the Eleventh Circuit observed,

"[A]t least eight of our sister circuits have reached the same conclusion [that we reach] about the meaning of the *Cipollone* decision." *Myrick I, supra* at 1522. Among those the Eleventh Circuit noted were *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818, 823 (1st Cir.1992) ("[T]he High Court has made it pellucidly clear that, whenever Congress includes an express pre-emption clause in a statute, judges ought to limit themselves to the pre-emptive reach of that provision without essaying any further analysis under the various theories of implied pre-emption.", *cert. denied,* 506 U.S. 1052, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993); *Toy Mfrs. of America, Inc. v. Blumenthal,* 986 F.2d 615, 623 (2d Cir.1992) ("[W]here a pre-emption provision provides a 'reliable indicium of congressional intent' a court is required to restrict its preemption analysis to that clause."); *Worm v. American Cyanamid Co.,* 5 F.3d 744, 747 (4th Cir.1993) ("Articulating a specific approach to interpreting a statute that expressly addresses preemption, the *[Cipollone ]* Court limited the task to first determining whether the relevant provisions reliably indicate congressional intent with regard to preemption of state authority, and second, if so, to interpreting the express language."); *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1420 (5th Cir.1993) ("Applying *Cipollone,* we reject, at the outset, Collagen's contention that we may resort to the doctrine of implied pre-emption . . . ."), *cert. denied* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); *American Agric. Movement, Inc. v. Board of Trade,* 977 F.2d 1147, 1154 (7th Cir.1992) ("Only if a statute is devoid of explicit pre-emptive language may we resort to either variant of implied pre-emption."); *Kinley Corp. v. Iowa Utilities Bd.,* 999 F.2d 354, 358 (8th Cir.1993) ("In the present case, we need look no further than the express statutory language [because] [t]he [statute] contains [an] express pre-emption provusion [sic] . . . ."); *Draper v. Chiapuzio,* 9 F.3d 1391 (9th Cir.1993) (since the federal act contains an express preemption provision that provides a reliable indicium of congressional intent, "[w]e therefore look only to this language and construe its preemptive effect as narrowly as possible"); *Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438, 1447 (10th Cir.) ("[W]hen the Court recently applied the doctrine of

*expressio unius est exclusio alterius* to preemption cases, it excluded consideration of all forms of implied preemption, including conflict preemption."), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). *Myrick I, supra* at 1522.

### *Freightliner Corp. et al. v. Myrick (Myrick II)*

On appeal from the Eleventh Circuit's decision in *Myrick I,* the Supreme Court recently undertook to explain its holding in *Cipollone* vis-a-vis implied preemption analysis in the face of an express preemption provision. *Freightliner Corp. et al. v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) *(Myrick II ).* First, the Court addressed the truck manufacturers' express preemption argument, and held that there could be no express preemption ·because the particular safety standard at issue, FMVSS 121, which applies to anti-lock brakes, was suspended, and was therefore not "in effect" for purposes of the preemption clause. *Id.* at —— – ——, 115 S.Ct. at 1486–87, 131 L.Ed.2d at 391–92.

The Court then summarily addressed the argument that *Cipollone* completely precluded any consideration of implied preemption. Mr. Justice Thomas, writing for the Court, stated:

Instead of announcing a categorical rule precluding the coexistence of express and implied pre-emption, however, the relevant passage in the opinion stated:

In our opinion, the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express language in § 5 [the preemption provision] of each Act. When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' ... 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation.

*Myrick II* at ——, 115 S.Ct. at 1488, 131 L.Ed.2d at 393, *quoting Cipollone, supra* at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423. The Court then clarified the *Cipollone* holding by stating that *Cipollone* articulated only an inference, and not a rule, that, where Congress has expressly preempted a certain area in a statute, matters outside that area are not preempted: "At best, Cipollone supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." *Id.* at ——, 115 S.Ct. at 1483, 131 L.Ed.2d at 393. Then, in a single, short paragraph, Justice Thomas dismissed petitioners' implied preemption argument as well; since there was no federal safety standard in effect, complying with a (non-existent) federal standard and a state standard would not be impossible, nor would compliance with a state standard frustrate "the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at ——, 115 S.Ct. at 1488, 131 L.Ed.2d at 394 (citation omitted). Having found neither express nor implied preemption, therefore, the Court affirmed the judgment of the Eleventh Circuit in *Myrick I.*

### Appellant's Arguments in the Instant Appeal

It is against this backdrop of case law that General Motors posits the following argument:

After *Cipollone* there are two alternatives only: (1) Section 1392(d) expressly preempts plaintiff's claim; or (2) section 1392(d), taken with the Safety Act's savings clause, § 1397(k), is not a 'reliable indicium' of Congress' intent to preempt, so this Court must 'look beyond' the preemption clause, under *Cipollone,* to implied preemption.

Appellant's brief at 7. We shall address these arguments in the order presented.

### Argument 1: § 1392(d) Expressly Preempts Common Law Liability

 Turning first to GM's argument that the Safety Act expressly preempts state common law causes of action, we note the Supreme Court's long-standing rule that the touch-

stone for any preemption analysis is the purpose of Congress. *Cipollone, supra* at 515–16, 112 S.Ct. at 2617, 120 L.Ed.2d at 422–23, *citing Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978), *quoting Retail Clerks Intern. Ass'n. v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). As this court stated in *Gingold*, "the 'sole task' in any preemption analysis is to determine Congress' intent." *Id.* at 354, 567 A.2d at 326. " 'The critical question in any pre-emption analysis . . . is always whether Congress intended that federal regulation supercede state law.' " *Id.* at 339, 567 A.2d at 318, *quoting Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369, 382 (1986). In order to determine that intent, courts have employed various rules of statutory construction and presumptions of law. We have already noted the presumption against preemption, and the rule that the expression of one thing in a statute implies the exclusion of others. *See* discussion of *Cipollone, supra.* Further support for the presumption against preemption is found in *Gingold*, in which this court stated:

> The presumption against preemption is explained on grounds which recognize, among other things, the States' long-established interest in providing compensation for victims of torts. '[I]t is necessary to bear in mind . . . the circumspect view courts must take of a claim that Congress has preempted states from exercising their traditional police powers on behalf of their citizens. The provision of tort remedies to compensate for personal injuries "is a subject matter of the kind [the] Court has traditionally regarded as properly within the scope of state superintendence." '

*Gingold, supra* at 340, 567 A.2d at 318, *quoting Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1542 (D.C.Cir.1984), *cert. denied, Chevron Chemical Co. v. Ferebee*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), *quoting Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963). More recently, this superior court, sitting *en banc*, has stated:

'Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States (are) not to be superseded by.... Federal Act unless that (is) the clear and manifest purpose of Congress'. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

... Courts must tread cautiously in this arena because the authority to displace a sovereign state's law is 'an extraordinary power ... that we must assume Congress does not exercise lightly.'

*Mazaika v. Bank One, Columbus, N.A.*, 439 Pa.Super. 95, 102–04, 653 A.2d 640, 644 (1994), *citing Cipollone, supra* at 515–16, 112 S.Ct. at 2617, 120 L.Ed.2d at 422–23; *and quoting Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 823 (1st Cir.1992), *citing Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). Furthermore, as we stated in *Mazaika:*

Defendant [appellant] bears the burden of persuasion on [the issue of preemption]; '[c]ourts are reluctant to infer preemption, and it is the burden of the party claiming Congress intended to preempt state law to prove it.' *Elsworth v. Beech Aircraft Corp.*, 37 Cal.3d 540, 548, 208 Cal.Rptr. 874, 691 P.2d 630 (1984) and cases cited therein.

*Mazaika, supra* at 103, 653 A.2d at 644.

■ In addition to the presumption against preemption and the *"expressio unius"* rule delineated above, courts addressing preemption issues have employed several other rules of statutory construction to aid in their analysis. Among these are the rule that, when interpreting a statute, the starting point is the language itself. *Gingold, supra* at 340–42, 567 A.2d at 319, *citing American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (other citations omitted). As the *Gingold* court explained:

It is to be presumed that 'the legislative purpose is expressed by the ordinary meaning of the words used,' ... and if the statutory language is clear, it is not necessary to

examine the legislative history.... '[O]ur attention must initially focus on the terms and plain meaning of the Act.'

*Gingold, supra* at 341, 567 A.2d at 319 (citations to U.S. and Pennsylvania supreme court cases omitted). Or, as the *Mazaika* court opined when interpreting the meaning of the word "interest" in the National Bank Act:

'The question, at bottom, is, one of statutory intent, and we accordingly "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." '

*Mazaika, supra* at 104, 653 A.2d at 645, *quoting Morales v. TWA Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992), *quoting FMC Corp. v. Holliday,* 498 U.S. 52, 56–58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990).

■ A further aid to the courts in construing the intent of Congress from the language of the statute is the rule that, where possible, the courts should give effect to all sections of an act rather than interpreting the language in such a way that one clause is rendered superfluous or meaningless for the benefit of another. *Taylor, supra* at 824, *citing United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955); *Myrick v. Freuhauf Corp.,* 13 F.3d 1516, 1520 (11th Cir.1994) (*Myrick I* ); *Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1120 (3rd Cir.1990), *citing Wood v. General Motors Corp.,* 865 F.2d 395, 420 (1st Cir.1988) (Selya, J. dissenting) ("in construing statutes, court's role is to give effect to them as written and as a whole, not to enforce one section at the expense of another"). This rule is a part of the broader rule that sections or clauses of a statute *in pari materia* should be construed together. *Black's Law Dictionary,* 403 (Abridged Fifth Ed.1983). *See also Gingold, supra* at 342–44, 567 A.2d at 320, *quoting Baird v. General Motors Corp.,* 654 F.Supp. 28, 30 (N.D.Ohio 1986) (" 'Reading [sections 1397[k] and 1392(d) ] in conjunction, it is clear that Congress did not intend to preempt common law liability when it established uniform national safety standards.' ").

Having thus established the framework in which to address GM's argument that § 1392(d) expressly preempts state common law causes of action, our task will be to determine the scope or extent of preemption intended by Congress. *Cipollone, supra* at 517–19, 112 S.Ct. at 2618, 120 L.Ed.2d at 423–24; *Gingold, supra* at 342–44, 567 A.2d at 320. To do so, we are required by the rules of statutory construction delineated above to interpret § 1392(d) *in pari materia* with § 1397(k). We must, therefore, construe the plain meaning [13] of the language in the two sections. As the *Myrick I* court stated:

> We are concerned with what Congress expressly stated about pre-emption, and in the Safety Act, Congress put its statements about pre-emption in two statutory provisions, one of which we refer to as a pre-emption clause and the other one of which we call a savings clause. Our terminology notwithstanding, both of the clauses are pre-emption provisions in the material sense of the word, because both clauses explicitly deal with the subject of what is and is not pre-empted.

*Myrick I, supra* at 1526. GM in the instant case would have us interpret § 1392(d) in a vacuum; at no point in its discussion of express preemption does GM even acknowledge the existence of § 1397(k). (*See* appellant's brief at 21–27.) Neither *Pokorny* nor *Gingold* permits such a myopic reading. Rather, we adopt this court's analysis in *Gingold, supra* at 342–44, 567 A.2d at 320, and the Eleventh Circuit's analysis in *Myrick I, supra* at 1526, that the two clauses, taken together, are the "express preemption provisions" of the statute. As the Third Circuit Court of Appeals stated in *Pokorny, supra:*

> [The auto manufacturer's] argument that Pokorny's common law action is expressly pre-empted by the Safety Act and Standard 208 is unconvincing, primarily because it focuses on one provision of the Safety Act, § 1392(d), without giving adequate consideration to the Act's savings

---

**13.** While *Cipollone* advises that the statute's language should be construed narrowly, *see Cipollone, supra* at 517–19, 112 S.Ct. at 2618, 120 L.Ed.2d at 423–24, we interpret the Court to mean that the plain meaning of the statute should be construed with an eye toward the presumption against preemption.

clause, § 1397(k). The question of express pre-emption is properly analyzed only after considering both § 1392(d) *and* § 1397(k).

*Pokorny, supra* at 1120 (emphasis in original).

Turning first, then, to § 1392(d), the so-called "preemption" provision, we find that it requires preemption of "any safety standard" established by a state if there is a federal motor vehicle safety standard covering the same aspect of motor vehicle safety in effect. The so-called savings clause, on the other hand, provides that compliance with a federal safety standard does not exempt anyone from liability under the common law. § 1397(k). Reading the two clauses in conjunction, as we are required to do by the rules of statutory construction, we find the Third Circuit's analysis in *Pokorny* instructive:

... When we consider § 1397(k) together with § 1392(d), we conclude that Congress did not intend all common law actions for design defects like Pokorny's to be expressly preempted by federal regulations like Standard 208.

Ford, however, argues that § 1397(k) should be construed narrowly, since its limited purpose is to express Congress's intent not to pre-empt the entire field of automobile safety. In other words, according to Ford, § 1397(k) was enacted to ensure only that state common law continues to exist where no federal safety standard has been promulgated.

Ford's construction undermines the express language of § 1397(k). Section 1397(k) specifically recognizes that compliance with a particular federal safety standard, like Standard 208, does not exempt Ford from common law liability.... The savings provision cannot be limited to matters not covered by the federal standards. We reject Ford's argument on this point ... The language of § 1397(k) does not reasonably support that narrow construction....

We also note that § 1392(d), the preemption provision, does not specifically mention common law liability. In the pre-emption clauses of many other statutes, Congress has explicitly referred to common law actions when it wished to

pre-empt them.... Nevertheless, Ford argues that our construction of § 1397(k) is inconsistent with § 1392(d) because common law liability has the same effect on automobile manufacturers as the other kinds of state regulation that are expressly pre-empted by § 1392(d). Although we recognize that common law damages may have an effect on automobile manufacturers similar to other safety standards established by states through statutory or regulatory processes, common law liability and state regulation have important differences [*citing Gingold, supra* ]. Ford's hypothesis about the economic effect of common law liability is a question more properly addressed to Congress than to a court. The judiciary must adhere to the framework Congress designed when it enacted the Safety Act. As we construe that Act, common law liability survives federal regulation, *even in those areas where federal safety standards have actually been established.* Pokorny's common law action is not expressly pre-empted by § 1392(d).

*Pokorny, supra* at 1121 (emphasis added). This court in *Gingold* anticipated the *Pokorny* court's analysis when it opined:

... [T]he plain language of section 1392(d) 'only prohibits the states from implementing safety standards of their own.' ... The section does not mention common law liability.... It follows that in the face of the broadly-worded section 1397[k] savings clause, if Congress had intended that section 1392(d) apply to common law claims as well as state created regulation it would have stated so.

*Gingold, supra* at 343–44, 567 A.2d at 320 (citations omitted).

We find the foregoing analyses by the *Pokorny* and *Gingold* courts convincing. When we apply them to the instant case, we find GM's argument that the express language of § 1392(d) preempts all "non-identical state common law standards" unpersuasive. (*See* appellant's brief at 21.) First, as we stated earlier, GM would have us read only the express language of § 1392(d); at no point in its discussion of express preemption does GM introduce the language of the savings clause. (*See* appellant's brief at 20–27.) Such selective reading is imper-

missible under the analyses set forth by both the Third Circuit and by this court. *See supra.* Second, when read in conjunction with § 1397(k), § 1392(d) "safety standards" must be read not to include state common law causes of action, as the alternative reading renders § 1397(k) nearly meaningless. As the Eleventh Circuit stated in *Taylor:*

> Because we have a duty to give effect, if possible, to every clause of a statute, ... we are inclined to reject the manufacturers' construction since it would render an entire section of the Safety Act superfluous.

*Taylor, supra* at 824, adopted by the court in *Myrick I,* supra at 1520. We agree.

GM's argument that *Cipollone* and "common sense" also require a reversal of *Gingold* is equally flawed. (Appellant's brief at 22.) In *Cipollone* the Supreme Court was called upon to determine the preemptive effect of two federal statutes; the 1965 Federal Cigarette Labeling and Advertising Act, (1965 Act), and the 1969 Public Health Cigarette Smoking Act, (1969 Act). The 1965 Act's preemption clause provided: "No statement relating to smoking and health shall be required in the advertising of [properly labeled] cigarettes." *Cipollone* at 518, 112 S.Ct. at 2618, 120 L.Ed.2d at 424 (citation omitted). A majority of the *Cipollone* court, recognizing the narrow scope of the "no statement" language in the 1965 preemption clause, held that this clause "merely prohibited state and federal rule-making bodies from mandating particular cautionary statements on cigarette labels ... or in cigarette advertisements." *Id.* The 1965 Act did not, however, prohibit state common law damages actions. *Id.* at 519–21, 112 S.Ct. at 2619, 120 L.Ed.2d at 424–25. In contrast, the 1969 preemption provision stated:

> '(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.'

*Id.* at 515, 112 S.Ct. at 2617, 120 L.Ed.2d at 422 (citation omitted). A plurality of the Court, recognizing that the

language "requirement or prohibition" swept more broadly than the "statement" language of the 1965 Act, proceeded to dissect the various common law actions at issue, finding some preempted and others not. *See Id.* at 519–32, 112 S.Ct. at 2619–2625 (plurality opinion). While the Court's plurality analysis has been sharply criticized, (*see Id.* at 530–46, 112 S.Ct. at 2625–32, 120 L.Ed.2d at 431–41, (Blackmun, J., Kennedy, J., and Souter, J. concurring in part, concurring in the judgment in part and dissenting in part; *Id.* at 544–56, 112 S.Ct. at 2632–2638, 120 L.Ed.2d at 440–48 (Scalia, J. and Thomas, J. concurring in the judgment in part and dissenting in part), we need not concern ourselves with that analysis for two reasons. First, the language at issue in the instant case, "safety standards," is much more closely akin in its scope to the language of the 1965 Act, "statements," than to the language of the 1969 Act, "requirements or prohibitions." In addition, neither of the Acts at issue in *Cipollone* had a savings clause the express language of which had to be considered in conjunction with the express language in the preemption clauses. For obvious reasons, therefore, that Court had no need to look beyond the language of the preemption clauses.

 Similarly, we find appellant's reliance upon cases finding that the Medical Devices Act, [MDA], 21 U.S.C. § 360k(a), preempts state common law causes of action equally unconvincing. The MDA contains a preemption clause that provides:

**(a) General rule**

Except as provided in subsection (b) of this section, no State or political subdivision of a state may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device . . .

21 U.S.C. § 360k(a). While we acknowledge that much of the language of the preemption clause in the instant case [14] closely parallels the language from the MDA cited *supra*, nevertheless, we note several important distinctions. First, the language "in addition to" in the preemption clause of the MDA clearly indicates that Congress did not intend the MDA to act as a "floor" below which medical device manufacturers could not fall; rather, Congress intended the MDA to be the *exclusive* means of regulating Class III medical devices. This intent is also apparent in the extensive pre-market approval process required for Class III medical devices, the extensive post-approval review the FDA conducts of these devices, and the FDA's authority to withdraw its approval permanently or to suspend its approval pending further study. *Green v. Dolsky,* 433 Pa.Super. 556, 563–65, 641 A.2d 600, 604 (1994). The courts of appeals analyzing the MDA's express preemption provisions after *Cipollone* likewise concluded that such extensive regulation by the FDA distinguished medical device cases from the regulations imposed upon cigarette manufacturers at issue in *Cipollone. Green, supra* at 565–67, 641 A.2d at 605, *citing King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993); *Stamps v. Collagen Corp.,* 984 F.2d 1416 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993).

In contrast, in the instant case, Congress clearly intended the regulations promulgated under the Safety Act as a mere threshold requirement, below which manufacturers could not fall if they wished to introduce their automobiles into the stream of United States commerce. Section 1391(2) of the Act provides that a motor vehicle safety standard is "a minimum vehicle safety standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." As the Eighth Circuit Court of Appeals stated in 1968:

14. For text of clause, see discussion of *Gingold, supra.*

General Motors contends that any safety standards in design and equipment should be imposed as envisioned by the [Safety Act] ... Recognizing the need to reduce traffic accidents and deaths and injuries resulting therefrom, Congress found it necessary to establish motor vehicle safety standards, and by this Act set up the machinery and administrative process to establish *minimum* safety standards. The purpose of this Act is manifest and the Congress recognizes ... that the public should be protected against unreasonable risks of accidents occurring as a result of the design, construction or performance of motor vehicles and also be protected against unreasonable risk of death or injury in the event accidents do occur.... Section 108(c) of the Act, 15 U.S.C. § 1397(c), expressly negatives any intention of Congress to acquire exclusive jurisdiction in this field and leaves the common law liability intact.

*Larsen v. General Motors Corp.*, 391 F.2d 495, 506 (8th Cir.1968). Support for this interpretation is found in the legislative history of the Act. That history was summarized by the *Gingold* court:

The Senate Report states that 'the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law.' S.Rep. No. 1301, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad. News 2709, 2720. The House report further provides that Congress 'intended, and this subsection [1397(c) ] specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law, *particularly those related to warranty, contract, and tort liability.*' H.R.Rep. No. 1776, 89th Cong., 2d Sess. 24 (1966). The remarks of individual Congressmen are unequivocal. '[C]ompliance with Federal standards does not exempt any person from common law liability.' 112 Cong.Rec. 21,487 (1966) (remark of Sen. Magnusson). *'The Act leaves intact] every single common law remedy* that exists against a manufacturer for the

benefit of a motor vehicle purchaser. This means that all of the warranties and all of the other devices of common law which are afforded to the purchaser, remain in the buyer, and they can be exercised against the manufacturer.' 112 Cong.Rec. 19,663 (1966) (remark of Rep. Dingell).

*Gingold, supra* at 350, 567 A.2d at 323–324 (emphasis added).

Further support for the view that Congress intended the FMVSS as a floor and not a ceiling is found in the following excerpt from the remarks by Congressman Tom Triplett of Chester, South Carolina, and published in the *Hearings Before the Committee on Interstate and Foreign Commerce of the House of Representatives,* ("Safety Act Hearings"), 89th Cong., 2d Sess., pt. 2, at 1249 (1966):

> We need a traffic safety agency and we need to research our problem from end to end, but we don't need to relieve the manufacturer of his natural [common law] responsibility for the performance of his product.
>
> . . . .
>
> You may think that the manufacturer is afraid of government regulation but the cry you are hearing may be 'Brier [sic] Fox, please don't throw me in the briar patch.' If the government assumes the responsibility of safety design in our vehicles, the manufacturers will join together for another thirty-year snooze under the veil of government sanction and in thousands of courtrooms across the nation wronged individuals will encounter the stone wall of 'our product meets government standards,' and an already compounded problem will be recompounded.

*Id., cited in* Kurt B. Chadwell, Comment, *Automobile Passive Restraint Claims Post–Cipollone: An End to the Federal Preemption Defense,* 46 Baylor L.Rev. 141, 180 (1994) (Chadwell). Congress thus clearly intended the FMVSS as a floor, not as the insurance policy against common law liability it has become in many jurisdictions.

In addition to the functional distinction between the MDA and the Safety Act just noted, a further basis for distinction is apparent. The MDA, like the Acts at issue in *Cipollone,* does

not contain a savings clause expressly precluding exemption from liability under state common law. The courts deciding the MDA cases post-*Cipollone* have thus had only the plain meaning of the "preemption" clause in the MDA upon which to rely. As noted *supra,* however, we must construe the plain meaning of the "preemption clause" in the Safety Act while at the same time preserving the integrity of the "savings clause." In so doing, we find that, not only did Congress fail to mention that state common law causes of action were expressly preempted; rather, its only mention of these causes of action was that they are expressly saved. Read in the context of 1397(k), the plain meaning of "safety standards" in 1392(d) clearly does not include common law liability. A reading of "safety standards" that would include common law liability would force us to expand the definition far beyond the plain meaning of the words in either clause, while rendering the savings clause nugatory.

We find further support for our analysis of the scope of "safety standards" in *Buzzard v. Roadrunner Trucking, Inc.,* 966 F.2d 777 (3rd Cir.1992). In *Buzzard,* the court was asked to decide whether the Safety Act, and in particular FMVSS 108, preempted state common law causes of action. FMVSS 108 set illumination standards for motor vehicles with which defendant's vehicle complied. Nevertheless, the Third Circuit found neither express nor implied preemption of plaintiff's common law causes of action, both of which sounded in tort. *Id.* at 781. In so holding, the court first found no express preemption of state tort liability. Without the benefit of *Cipollone,* the *Buzzard* court then engaged in an implied "conflict" preemption analysis, and found no implied preemption. The basis for this holding was the distinction the court found between the safety standard at issue in *Buzzard* and the standard at issue in *Pokorny;* FMVSS 108 provided no options, whereas FMVSS 208, as discussed *supra,* provides three options from which manufacturers may choose in order to comply with the standard. Although admittedly, we fail to understand such a distinction, more important to our analysis

was the *Buzzard* court's analysis of § 1397(k), read in conjunction with § 1392(d). As that court stated:

> Considering those clauses together in *Pokorny,* we held that 'Congress did not intend all common law tort actions for design defects ... [to] be expressly pre-empted by [federal motor vehicle safety standards].' *Pokorny,* 902 F.2d at 1121. Section 1397(k) specifically states that compliance with federal standards does not exempt persons from common law liability. In *Pokorny,* we refused to construe the savings clause of section 1397(k) so narrowly that it would apply only to common law actions wholly beyond the Safety Act's purview. *See id.* at 1121.

*Buzzard,* 966 F.2d at 780. From the foregoing, it is clear that the *Buzzard* court read the savings clause's "not exempted from common law liability" language in such a way that it included no express preemption of common law liability.

Our analysis in *Gingold* of the distinction between common law damage awards and regulation adds further support for our position and convinces us that reading common law liability into "safety standards" is neither necessary nor proper. In *Gingold,* the court adopted the analysis of Mr. Justice Blackmun in his dissent in *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). In *Silkwood,* a majority of the Court found that state common law causes of action, including punitive damage awards, were not preempted by the Atomic Energy Act. Mr. Justice Blackmun would have found the punitive damage awarded preempted as akin to regulation, and drew the following distinction between punitive damage awards and compensatory damage awards, the kind of liability at issue in the instant case:

> It is true that the prospect of compensating victims of nuclear accidents will affect a licensee's safety calculus. Compensatory damages therefore have an indirect impact on daily operations of a nuclear facility.... The crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate safety, whereas the purpose of compensatory damages is to compensate victims. *Because the Federal Government does not*

*regulate the compensation of victims, and because it is inconceivable that Congress intended to leave victims with no remedy at all,* the pre-emption analysis established by *Pacific Gas [& Electric Co. v. State Energy Resources Conversation & Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) ] comfortably accommodates—indeed it compels—the conclusion that compensatory damages are not pre-empted whereas punitive damages are. *Gingold, supra* at 346–47, 567 A.2d at 322 (*citing Silkwood, supra* at 263–64, 104 S.Ct. at 629–30 (Blackmun, J. dissenting) (footnote omitted) (emphasis added).

Finally, expanding the reading of "safety standards" to include state common law causes of action would directly conflict with the *Cipollone* court's admonishment to presume no preemption of matters historically under the states' police powers. *Cipollone, supra* at 515–16, 112 S.Ct. at 2617, 120 L.Ed.2d at 422–23.

Having found that state common law causes of action are not "safety standards," we must conclude our analysis of the plain meaning of the preemption language in the Safety Act, as that is the only question before us today; what "safety standards" *does* include need not concern us. Unlike GM, we find that common law liability is not preempted; to the contrary, it is expressly preserved. As the *Gingold* court stated, "Congress has *expressly* articulated its intent to preserve actions at the common law notwithstanding any compliance with the FMVSS." *Gingold, supra* at 355, 567 A.2d at 326–327 (emphasis in original).

Having found no express preemption of state common law causes of action, we find, consistent with *Gingold,* that state common law causes of action are *expressly not preempted,*[15]

---

15. We note a distinction between our holding here today, which follows the holding in *Gingold,* and the holding in *Pokorny, supra, Taylor, supra,* and *Myrick I, supra.* Today we hold, as did *Gingold,* that state common law causes of action are *expressly not preempted. Gingold, supra* at 326–27. As a result, even without the holding of *Cipollone,* we would have found no need to engage in an implied preemption analysis. *See Id.* at 327. In contrast, the *Pokorny, Taylor,* and *Myrick I* courts found that state common law causes of action were *not expressly preempted.*

e.g., preservéd. As a result, we turn next to GM's argument that, since the "preemption clause" (§ 1392(d)) does not contain a reliable indicium of congressional intent when read in conjunction with § 1397(k), this court must "look beyond" the preemption clause to implied preemption. (Appellant's brief at 7, 29.)

> *Argument 2: § 1392(d) and § 1397(k) Together Do Not Provide A Reliable Indicium of Congressional Intent; Therefore, Implied Preemption Analysis is Required*

■ As we stated in *Gingold, supra,* preemption " 'is compelled [when] Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " *Id.* at 338, 567 A.2d at 318, *quoting Fidelity Federal Savings and Loan Association v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982) (citations omitted). Until the Supreme Court's decision in *Cipollone,* a mere finding that common law causes of action were not expressly preempted [16] triggered a further, *implied*

*Pokorny, supra* at 1121; *Taylor, supra* at 825; *Myrick I, supra* at 1527–28. As a result, *Pokorny* and *Taylor,* the two pre-*Cipollone* cases, felt compelled by pre-*Cipollone* preemption analysis to determine whether the common law causes of action were impliedly preempted. *See, for example, Cipollone v. Liggett Group, Inc.,* 789 F.2d 181 (3rd Cir.1986), *citing Silkwood, supra* at 247–49, 104 S.Ct. at 621, 78 L.Ed.2d at 451–53; *de la Cuesta, supra* at 151–54, 102 S.Ct. at 3022, 73 L.Ed.2d at 675–75; *Pacific Gas, supra* at 203–05, 103 S.Ct. at 1722, 75 L.Ed.2d at 764–65 ("Without the aid of express language, a court may find intent to preempt in two general ways.... First, a court may determine that Congress intended 'to occupy a field' in a given area ... Second, in those instances where Congress has not wholly superceded state regulation in a specific area, state law is preempted 'to the extent that it actually conflicts with federal law.") *See also Buzzard v. Roadrunner Trucking, Inc.,* 966 F.2d 777 (3rd Cir.1992), discussed *supra.* The distinction between "expressly not preempted" and "not expressly preempted" is thus more than mere word play.

Post-*Cipollone,* however, the distinction is one without a difference, as either finding will yield the same strong inference that, in the presence of express preemption language in the statute that provides a reliable indicium of congressional intent, implied preemption analysis is foreclosed. *See, for example, Myrick I, supra* at 1528.

**16.** For a discussion of the distinction between "not expressly preempted" and "expressly not preempted," see n. 15, *supra.*

preemption analysis. *See, for example, Taylor, supra, Pokorny, supra,* and the Third Circuit's 1986 *Cipollone* analysis, *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181 (3rd Cir.1986). Implied preemption analysis then followed one of two prongs: either preemption was inferred from Congress' intent to occupy the field; or preemption was inferred because state requirements created an actual conflict with federal law. The conflict prong itself then followed one of two paths: either performance of both state and federal requirements was impossible; or state requirements stood "as an obstacle to the accomplishment of the full purposes and objectives of Congress." *See Pokorny, supra* at 1120, *citing Schneidewind, supra* 485 U.S. at 299–300, 108 S.Ct. at 1150–51 (citations omitted). Post–*Cipollone,* however, the courts have been bound by the standard enunciated by the Supreme Court in that decision, and cited *supra.* We set it out again for the benefit of the reader:

> When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' ... 'there is no need to infer congressional intent to preempt state laws from the substantive provisions' of the legislation.

*Cipollone, supra* at 517, 112 S.Ct. at 2618, 120 L.Ed.2d at 423, *citing California Federal Savings & Loan Assn. v. Guerra,* 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.). Our task today, then, given provisions in the Safety Act explicitly addressing the issue of preemption, is to determine whether those provisions "provide[ ] a 'reliable indicium of congressional intent with respect to state authority.' " *Id.* In order to make such a determination, however, we must first determine what this phrase requires. The Eleventh Circuit Court of Appeals has provided a helpful analysis of the "reliable indicium" mandate in its *Myrick I* opinion. Since the Supreme Court in *Myrick II* did not question *Myrick I* 's "reliable indicium" analysis, we will use it as a guideline.

The automobile manufacturers in *Myrick I,* a post-*Cipollone* Safety Act case,[17] argued for implied preemption on the basis that the express preemption clause in the Safety Act did not provide a reliable indicium of congressional intent. *Myrick I, supra* at 1525. As a result, the manufacturers argued, the *Cipollone* "rule"[18] that an express preemption clause precludes implied preemption analysis was inapplicable. *Id.* The manufacturers based their "no reliable indicium" argument on the alleged conflict between the "preemption" clause and the savings clause, on the alleged ambiguity such an alleged conflict created, and on the lack of reference to common law causes of action in the "preemption" clause. *Id.* at 1525–27. In dismissing the manufacturers' arguments, the *Myrick I* court stated the following:

> We can only infer from the way in which the Supreme Court [in *Cipollone* ] failed to pause for long over the matter that the reliable indicium requirement is not much of a hurdle. That inference is reinforced by the [*CSX Transp., Inc. v.*] *Easterwood* [507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) ] decision in which the Court said the task of statutory construction must begin with the plain wording of an express pre-emption clause, and then ended it there as well. There was no mention in *Easterwood* of the 'reliable indicium' requirement.
>
> None of our sister circuits that has considered application of the *Cipollone* rule to various statutes has yet found a preemption clause that was not a reliable indicium of congressional intent. . . .
>
> At the very least, the treatment of the requirement in *Cipollone,* and in decisions that have applied the rule of *Cipollone,* establishes that there is a presumption that a pre-emption clause is a reliable indicium of congressional intent. Such a presumption is in keeping with the general rule of assuming that Congress intended what it said. . . .
>
> Even without such a presumption, we would be convinced that the express pre-emption provisions of the Safety Act

**17.** See discussion *supra.*

**18.** See discussion *supra,* regarding *Myrick II* 's reading of *Cipollone* as establishing an inference, not a rule.

are a reliable indicia [sic] of congressional intent. The legislative history so indicates. The House Committee Report describes the congressional intent about pre-emption and the purpose of the savings clause which was written into the Act:

> [T]he reported bill provides that compliance with any Federal motor vehicle safety standard does not exempt a person from any liability under common law.
>
> It is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contracts, and tort liability.

H.R.Rep. No. 1776, 89th Cong., 2d Sess. 24 (1966). The legislative history demonstrates that the pre-emption provisions of the Safety Act, *which include the savings clause,* are a reliable indicium of congressional intent. . . .

. . . *Cipollone* itself is inconsistent with the notion that ambiguous statutory language cannot provide a reliable indicium of congressional intent. If all that were required to defeat the *Cipollone* rule is for some ambiguity or uncertainty to exist, then few, if any, pre-emption provisions would ever be held to be reliable indicia of congressional intent.

*Myrick I* at 1525–27 (emphasis added) (citations and footnotes omitted).

We agree with the Eleventh Circuit's thorough analysis of the "reliable indicium" requirement as it relates to the pre-emption provisions of the Safety Act. We therefore find that the two preemption provisions in the Act, the actual "preemption" clause and the savings clause, taken together, provide a reliable indicium of congressional intent. As a result, our next task is to apply the next step in the *Cipollone* court's analysis.

Following its "reliable indicium" requirement, the *Cipollone* court then discussed the "familiar principle" of "*expression* [sic] *unius est exclusio alterius,*" stating, "Congress' enactment of a provision defining the pre-emptive reach of a statute

implies that matters beyond that reach are not pre-empted." *Id.* As noted earlier, in *Myrick II*, Mr. Justice Thomas, speaking for the Court, interpreted this language as supporting a strong inference that express preemption language forecloses the possibility of any implied preemption. *Myrick II, supra,* —— U.S. at —— – ——, 115 S.Ct. at 1487–88, 131 L.Ed.2d at 392–94. Applying this analysis to the instant case, we note that we have already found an express preemption provision, comprised of two clauses, in the Safety Act. These provisions have withstood the test enunciated by the Supreme Court in *Cipollone:* they are a reliable indicium of congressional intent; and their language is clear and unambiguous when they are read together. As a result, we are required by *Cipollone/Myrick II* to infer foreclosure of implied preemption. *Myrick II, supra* at —— – ——, 115 S.Ct. at 1487–88, 131 L.Ed.2d at 392–94 (citations omitted).

We are confident that, had the *Pokorny* court been able to utilize *Cipollone* and *Myrick II* in its analysis, it would have drawn the same inference. As a result, the *Pokorny* court would have concluded that implied preemption analysis is inappropriate where, as here, a reliable indicium of congressional intent can be ascertained from the plain meaning of the express preemption language in the Safety Act. *Cipollone, supra* at 517–19, 112 S.Ct. at 2618, 120 L.Ed.2d at 423–24.

*Conflict Analysis and the Supremacy Clause Post–Cipollone*

Appellant's final claims on appeal all present the allegation that appellee's state common law causes of actions are in conflict with the federal law. Specifically, appellant argues:

a. Ground 1: A state rule imposing damages for choosing to install one FMVSS authorized restraint system instead of another punishes the exercise of a federal option;

b. Ground 2: Permitting states to limit the exercise of a FMVSS 208 option would destroy the uniformity the act is meant to achieve; and

c. Ground 3: Allowing air-bag claims would destroy the federally mandated phase-in.

Appellant briefs these claims within the context of an implied preemption analysis, arguing that state law claims stand as an obstacle to the full purposes and objectives of federal law. As set out in the foregoing, we do not feel compelled to engage in an implied preemption analysis, finding as we have that such an exercise is foreclosed by the holding of *Cipollone.*

We clearly recognize, however, as did Justice Scalia in dissent in *Cipollone* and as alluded to by Justice Thomas in *Myrick II,* that conflict analysis is the *sine qua non* of any preemption analysis. As commanded by the Supremacy Clause of the Constitution:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

In 1991, a panel of experts on the law of preemption published a pamphlet in which they set forth criteria for analyzing conflict within the context of express and implied preemption. Kenneth Starr et al.,[19] American Bar Association Section of Antitrust Law, *The Law of Preemption, a Report of the Appellate Judges Conference* (1991) (Starr):

> [T]he paradigmatic preemption case involves an *actual conflict* between state and federal law. This situation exists where it is physically impossible for a party to comply with both state and federal requirements. In such cases, preemption analysis requires a straightforward application of the Supremacy Clause. A similarly straightforward form of preemption occurs where Congress has explicitly provided for preemption of state law.

**19.** Other authors are: Patrick E. Higginbotham, Stephanie K. Seymour, William C. Clark, John Criswell, and Joe Sneed. The Pamphlet was reviewed by Paul J. Mishkin, William Van Alstyne and Laurence H. Tribe.

Relatively few preemption cases, however, turn on express preemption provisions or involve actual conflicts of the *Gibbons* [20] variety. Rather, Supremacy Clause cases typically call on the courts to discern or infer Congress's preemptive intent. Such preemption-by-implication has been based on the comprehensiveness of federal regulation, the nature of the subject matter regulated by Congress, the impact of state law on federal statutory purposes, and, in the case of preemption by administrative agencies, the scope of authority delegated by Congress to an agency. To be sure, the task for the courts in all of these instances is one of statutory interpretation, that is, whether the federal enactment, when considered in light of the Supremacy Clause, evinces Congress's intent to displace state law. The interpretive exercise invariably summons forth judgment, flowing from time-honored and respectful examination and analysis of Congress's handiwork by the courts. Yet the distinction between express (and actual conflict) preemption and implied preemption is important. By their very nature, implied preemption doctrines authorize courts to displace state law based on indirect and sometimes less than compelling evidence of legislative intent. This indirectness in turn suggests a greater potential for unpredictability and instability in the law.

*Starr, supra* at 14 (emphasis in original) (footnotes omitted).

■■■■■ Simply put, whether a conflict exists will be based on two criteria; whether compliance with the goals and purposes of the federal legislation has been rendered impossible or so frustrated by the state law that the state law must fall. If compliance is rendered impossible, (the *Gibbons* variety), only a straightforward application of the Supremacy Clause is required to find preemption. Where, however, conflict is less

20. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Gibbons, who had been granted a federal license to ply the waters with his steamboats, was being excluded from New York's waters because a state monopoly on use of those waters had been assigned to Ogden by the original state grantees. Thus, there was a "collision" between state and federal authority. *See* Starr, *supra* at 8–9.

apparent and more an indirect consequence of the interplay between the federal and state law, preemption is found by implication.[21] After *Cipollone*, however, preemption may only be inferred if Congress has allowed for such an inference. When Congress includes express language regarding the preemptive reach of legislation, either by expressly preempting or not preempting state action, it can be presumed that Congress recognized the tension that exists between federal and state law. By expressly preserving state action, it may be said that Congress has recognized that certain perceived conflicts, represented by such state action, are inevitable and acceptable as long as they do not present an insurmountable obstacle to the accomplishment of the purposes and objectives of the federal law—a straightforward Supremacy Clause violation. As enunciated by the Supreme Court in *Silkwood, supra:*

> In sum, it is clear that in enacting and amending the Price–Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority

---

**21.** Justice Scalia posed an example of the impossibility type of conflict in his dissent in *Cipollone:*

[T]hat if a federal consumer protection law provided that no state agency or court shall assert jurisdiction under state law over any workplace safety issue with respect to which a federal standard is in effect, that a state agency operating under a state law dealing with a subject other than workplace safety (e.g., consumer protection) could impose regulations entirely contrary to federal law—forbidding, for example, the use of certain safety equipment that federal law requires.

*Cipollone, supra* at 546–48, 112 S.Ct. at 2633, 120 L.Ed.2d at 441–43. An example of the frustration of purpose conflict is found in *Pokorny's* analysis undertaken in the context of implied preemption. The *Pokorny* court found an "actual conflict," not by looking to the clear and express language and intent of the preemption and savings clauses, or by determining whether it was possible for the Act and state claims to coexist. Rather, the Third Circuit inferred that common law liability interferes with the regulatory methods chosen by the federal government to achieve the Safety Act's stated goals, thus undermining the flexibility that Congress intended to give auto manufacturers in the area. With all due respect to the Circuit, such a conflict is less an insurmountable obstacle and more an indirect consequence of the interplay of the federal legislation and the state common law.

to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

*Id.* at 256, 104 S.Ct. at 625, 78 L.Ed.2d at 457.

▉ Instantly, and based upon our extensive analysis of express preemption, *supra*, we find a clear statement by Congress that common law causes of action are not in conflict with the goals and purposes of the Safety Act. Therefore, we are precluded from finding such a conflict by implication, as appellant would have us do. Rather, we find the Eighth Circuit's analysis in *Larsen* compelling. As that court stated:

It is apparent that the National Traffic Safety Act is intended to be *supplementary of and in addition to the common law of negligence and product liability*. The common law is not sterile or rigid and serves the best interests of society by adapting standards of conduct and responsibility that fairly meet the emerging and developing needs of our time. The common law standard of a duty to use reasonable care in light of all the circumstances can at least serve the needs of our society until the legislature imposes higher standards or the courts expand the doctrine of strict liability for tort. The Act is a salutary step in this direction and not an exemption from common law liability.

*Larsen, supra* at 506 (emphasis added). We agree.

## CONCLUSION

Thus, having found that implied preemption analysis of the Safety Act is foreclosed by *Cipollone/Myrick II*, and having

found that state common law causes of action are expressly not preempted by the Act and are not in actual conflict with the Act, we find that appellee's state common law causes of action are not preempted.

As the *Gingold* court admonishes, it is important at this juncture to remember our procedural bearings:

A finding of no federal preemption [of state law causes of action] merely allows [plaintiff] to raise [his] passive restraint claims at trial. This by no means insures that [he] will prevail. It is not inconceivable that a jury could reject the claims.... [T]he only issue before us is whether Congress intended that such issues go before juries. It did. Congress articulated this intent in section 1397[k]....

. . . .

... Tort actions can lead to greater insights into the inherent hazards or shortcomings of existing occupant restraint systems and test the public's acceptance of new systems through jury verdicts. Moreover, 'the specter of damage actions may provide manufacturers with added dynamic incentives to continue to keep abreast of all possible injuries stemming from the use of their product so as to forestall such actions through product improvement.' ... Viewed in this manner, section 1397[k] is in complete harmony with the purpose of the Act as set forth in section 1381.

*Gingold, supra* at 354–55, 360, 567 A.2d at 326, 329 (citations omitted).

Accordingly, for the foregoing reasons, we affirm the order of the trial court below denying appellant General Motors' preliminary objections and remand for further proceedings consistent with this opinion.

BROSKY, J. concurs in the result.